April STEVENS, et al., Plaintiffs,

v.

STEAK N SHAKE, INC., Defendant.

No. 97–1184–Civ–ORL–19C.

United States District Court, M.D. Florida, Orlando Division.

Sept. 3, 1998.

Jeffrey E. Mandel, Teresa Adamson Herrmann, Muller, Mintz, Crosland & Bramnick, Orlando, FL, for Defendant.

## ORDER

FAWSETT, District Judge.

This cause came before the Court on the Report and Recommendation of the United States Magistrate Judge (Doc. No. 50, filed August 21, 1998), which recommended that Defendant's Motion for Summary Judgment (Doc. No. 18, filed May 1, 1998) be granted, and Plaintiffs' Written Objections to the Magistrate's Report and Recommendation on Summary Judgment filed August 21, 1998 (Doc. No. 52, filed August 27, 1998).

In this case, Plaintiffs contend that they were discriminated against when a server at Defendant's restaurant asked them to prepay for their meals. Plaintiffs maintain that white patrons were not required to prepay.

On May 22, 1998, this matter was referred to the United States Magistrate Judge for a Report and Recommendation on Defendant's Motion for Summary Judgment. (Doc. No. 33). In a thorough Report and Recommendation, the United States Magistrate Judge recommended that Defendant's motion be granted. (Doc. No. 50).

Plaintiffs timely objected to the United States Magistrate Judge's Report and Recommendation ("Report"). (Doc. No. 52). Consequently, the Court will review the portions of the Report to which Plaintiffs objected under a *de novo* standard of review. *See* Fed.R.Civ.P. 72(b).

Upon a *de novo* review of the record in this case, the Court finds that the Report accurately states the relevant law and facts in this case. However, there is one fact in the Report that is irrelevant to the disposition of the case but is incorrectly stated and warrants discussion by the Court. Ms. Sexton, who sat near Plaintiffs at the time of the incident and was not asked to prepay, asseverated that her initial waitress, Ms. Chamblee, did not give her the bill for her food. (Doc. No. 36, ¶ 6). Rather, Ms. Sexton stated that a second waitress, Ms. Squires, gave her the bill. *See id.* It was Ms. Squires who took Plaintiffs' food order, served them their

Mark D. Barth, McKeever, Albert & Barth, Orlando, FL, for Plaintiffs.

meals, and asked them to prepay for their meals. The Magistrate Judge indicated that Ms. Chamblee gave Ms. Sexton her bill for the food. (Doc. No. 50, at 12).

The Court finds that this factual difference does not obviate Plaintiffs' inability to show that Ms. Sexton was similarly situated to them. The record is clear that Ms. Squires did not take Ms. Sexton's food order and was not primarily responsible for Ms. Sexton. The record is also clear that Ms. Squires did take Plaintiffs' food order and was primarily responsible for Plaintiffs. In addition, Plaintiffs have not refuted Defendant's evidence that Ms. Squires, in violation of Defendant's stated policy, asked all her customers, Blacks and Whites, to prepay for their food during the "bar rush" on the night of the incident. *See* (Doc. No. 50, at 8–9) (defining "bar rush"). Consequently, Plaintiffs have not shown that Ms. Sexton was similarly situated to Plaintiffs and, thus, have not shown that genuine issues of material fact exist regarding whether they were subjected to unlawful discrimination.[1]

Based on the foregoing, the Court rules as follows:

(1) With the exception noted above, the Court hereby **ADOPTS** the Report and Recommendation of the United States Magistrate Judge (Doc. No. 50, filed August 21, 1998), which recommended that Defendant's

Motion for Summary Judgment (Doc. No. 18, filed May 1, 1998) be granted.

(2) Defendant's Motion for Summary Judgment (Doc. No. 18, filed May 1, 1998) is **GRANTED.**

(3) The Clerk is directed to close this case.

(4) The Clerk is directed to enter Judgment in favor of Defendant Steak 'n' Shake, Inc. and against Plaintiffs April Stevens and Anita Harris.

### REPORT AND RECOMMENDATION

GLAZEBROOK, United States Magistrate Judge.

This cause came on for oral argument on July 29, 1998 on the following motion:

MOTION: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Docket No. 18]

FILED: May 1, 1998

RECOMMENDATION: GRANTED.

### I. *INTRODUCTION*

Plaintiffs April Stevens ("Stevens") and Anita Harris ("Harris") are African–Americans. *See* Docket No. 2. Stevens and Harris claim that defendant Steak n Shake, Inc. ("Steak n Shake") violated Florida law—the Florida Civil Rights Act of 1992, Fla.Stat. § 760.02 *et. seq.* and Fla.Stat. § 509.092.[1] *See*

---

1. Plaintiffs also contend that the Report did not consider Ms. Sexton's statement that she was not "aware" of any white customers who were asked to prepay by Ms. Squires. (Doc. No. 52, at 4). The Court finds that Ms. Sexton's lack of awareness is not probative of whether there were, in fact, white customers who were asked to prepay by Ms. Squires. Plaintiffs' remaining arguments are without merit and do not warrant discussion.

1. Stevens and Harris originally filed this action—which is based solely on Florida law—in the Circuit Court of the Seventh Judicial Circuit in Volusia County, Florida. On September 27, 1997, Steak n Shake removed the action to this Court alleging that it is an Indiana corporation with its principal place of business in Indiana, that Stevens and Harris are Florida residents, and that Stevens and Harris "have requested damages in excess of $75,000." Docket No. 1 at 2, 11 and 12 at 2. The complaint makes no such specific demand. Docket No. 2. At the hearing on summary judgment, counsel for Stevens and Harris informed the Court that neither of plain-

tiffs' claims of discrimination by Steak n Shake "exceeds the sum or value of $75,000, exclusive of interest and costs" as that term is used in 28 U.S.C. § 1332(a) even if attorneys fees were to be included, but that Stevens' and Harris' two claims (together with attorneys fees) do exceed $75,000 when combined or aggregated. The general rule has long been that multiple plaintiffs may not aggregate their claims to exceed the jurisdictional amount for diversity purposes. *See Eagle Star Insurance Co. v. Maltes*, 313 F.2d 778, 781–82 (5th Cir.1963); *accord, Payne v. State Farm*, 266 F.2d 63, 64 (5th Cir.1959), adopted as binding precedent, *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc). The Court ordered the parties to bring to its attention any law or facts suggesting that the Court lacks subject matter jurisdiction over this wholly state law claim, but no party has yet done so. *See Broughton v. Florida Int'l Underwriters, Inc.*, 139 F.3d 861, 863 (11th Cir.1998) (Court will not dismiss case for lack of diversity jurisdiction unless it appears to a legal certainty that

Docket No. 2. Specifically, Stevens and Harris argue that Steak n Shake, acting through a server, a shift supervisor, and a black male manager, discriminated against them based on their race by requiring that they prepay their meal. *See id.*

Steak n Shake has moved for summary judgment on the ground that Stevens and Harris are unable to prove a *prima facie* case of discrimination under Fla.Stat. § 509.092, *i.e.,* that Steak n Shake denied them the full benefits or enjoyment of the Steak n Shake restaurant, and that similarly situated Caucasian customers received full benefits or enjoyment. Docket No. 19. Having considered the parties' submissions, the Court **RECOMMENDS** that Steak n Shake's motion for summary judgment be GRANTED.

## II. *THE LAW*

### A. Standard of Review on Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jeffery v. Sarasota White Sox,* 64 F.3d 590, 593–94 (11th Cir.1995); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir.1991). A moving party discharges its burden on a motion for summary judgment by showing the Court that there is an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. *Id.* When a moving party has discharged its burden, the non-moving party must then "go beyond the

pleadings," and by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman,* 873 F.2d 256 (11th Cir.1989); *Samples on Behalf of Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). The Eleventh Circuit has explained the reasonableness standard:

> in deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted]. The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*Jeffery v. Sarasota White Sox,* 64 F.3d 590, 594 (11th Cir.1995), quoting *WSB–TV v. Lee,* 842 F.2d 1266, 1270 (11th Cir.1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Augusta Iron and Steel Works v. Employers Insurance of Wausau,* 835 F.2d 855, 856 (11th Cir.1988). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter

plaintiff's claim is actually for less than the juris-

dictional amount).

of law." *Id.* at 251–52, 106 S.Ct. 2505. On a summary judgment motion the Court may not weigh the credibility of the parties. *See Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1531 (11th Cir.1987). If the determination of the case rests on which competing version of the facts or events is true, the case should be presented to the trier of fact. *Id.*

In assessing the proof on summary judgment in public accommodation cases, the district court applies the burden-shifting analysis in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Jackson v. ABC Liquors,* 983 F.Supp. 1388, 1391 (M.D.Fla.1997); *Hornick v. Noyes,* 708 F.2d 321, 325 (7th Cir. 1983) (§ 2000e discrimination case). If the plaintiff succeeds in proving a *prima facie* case of discrimination, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse treatment. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. However, the defendant's burden is only one of production, not persuasion. *See Jackson,* 983 F.Supp. at 1392. Once the defendant has articulated legitimate, non-discriminatory reasons, the burden shifts to the plaintiff to show both that the reason given was false, and that discrimination was the real reason. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2750, 125 L.Ed.2d 407 (1993).

### B. Florida Statute § 509.092

Florida law prohibits restaurants from refusing to serve someone because of his or her race or color. Section 509.092 of the Florida Statutes provides:

> Public lodging establishments and public food service establishments are private enterprises, and the operator has the right to refuse accommodations or service to any person who is objectionable or undesirable to the operator, *but such refusal may not be based upon race, creed, color,* sex, physical disability or national origin. A person aggrieved by a violation of this section or a violation of a rule adopted under this section has a right of action pursuant to § 760.11.

Fla.Stat. § 509.092 (emphasis supplied). The statute nowhere defines the term "such refusal may not be based upon race, creed, [or] color ..." Section 760.11 of the Florida Statutes merely provides the procedure for asserting a claim under § 509.092, but does not define the substantive right. Neither the United States Court of Appeals for the Eleventh Circuit, nor the Florida Supreme Court, nor the inferior federal and state courts have ever construed Fla.Stat. § 509.092. Indeed, neither of the parties located a single case interpreting the relevant language in Fla. Stat. § 509.092.

The Florida legislature patterned the Florida Civil Rights Act after Title VII of the Civil Rights Acts of 1964 and 1991, 42 U.S.C. § 2000, *et. seq. See Florida State University v. Sondel,* 685 So.2d 923, 925 n. 1 (Fla. 1st DCA 1996); *accord, Florida Dep't of Community Affairs v. Bryant,* 586 So.2d 1205, 1208 (Fla. 1st DCA 1991). Both parties agree that the Florida Supreme Court would interpret the meaning of Fla.Stat. § 509.092 by looking to Titles II and VII of the Civil Rights Act of 1964, § 201, *et. seq.,* as amended, 42 U.S.C. § 2000a, *et. seq.,* and to other federal civil rights public accommodation cases brought pursuant to 42 U.S.C. § 1981. Accordingly, this Court looks to established federal public accommodation law in order to determine the meaning of the term "such refusal may not be based upon race, creed, [or] color ..." in Fla.Stat. § 509.092, and to determine the elements of Stevens' and Harris' civil rights claims under the Florida statute.

### C. The Federal Public Accommodation Law

The United States Congress has enacted two statutes that establish civil rights in the context of public accommodations: 1.) Title II of the Civil Rights Act of 1964, § 201, *et. seq.,* as amended, 42 U.S.C. § 2000a, *et. seq.;* and 2.) 42 U.S.C. § 1981. Title II provides:

> All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

42 U.S.C. § 2000a(a). A "place of public accommodation" includes restaurants, lunch counters, and other food establishments whose operations affect commerce. An operation affects commerce where a substantial portion of the food served has moved in interstate commerce, or where the establishment offers to serve interstate travelers. 42 U.S.C. § 2000a. Section 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

■■■ To establish a *prima facie* case of discrimination under federal law—and by analogy under Fla.Stat. § 509.092— plaintiff must demonstrate: 1.) that she is a member of a protected class; 2.) that defendant intended to discriminate against her on that basis; and 3.) that defendant's racially discriminatory conduct abridged a right enumerated in the statute. *See Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir.1996) (African–American claimed § 1981 race discrimination in making and enforcing a retail contract). A practice that affects all races in the same manner does not prove a racially discriminatory intent (the second element). *See Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 952 (11th Cir.1991). Proof that services remained available to others outside the protected class is relevant to proving that defendant's conduct is *racially* discriminatory (the third element). *See White v. Denny's Inc.,* 918 F.Supp. 1418, 1424 (D.Colo.1996). Of course, evidence of how the defendant treated others outside the protected group is not always available. *See Hampton v. Dillard Department Stores, Inc.,* 985 F.Supp. 1055, 1059 n. 2 (D.Kan.1997).

In *Morris,* 89 F.3d at 413, the United States Court of Appeals for the Seventh Circuit held that the district court had properly granted summary judgment for defendant Office Max. Two African–American plaintiffs claimed that Office Max had interfered with their right to make and enforce a retail contract in violation of 42 U.S.C. § 1981 when an Office Max employee stopped the plaintiffs for acting suspiciously. Both plaintiffs had shopped at Office Max before, and had failed to produce evidence that Office Max interfered with their right to make purchases or enter into contracts. The Seventh Circuit affirmed summary judgment for Office Max, and held that the plaintiffs "were denied neither admittance nor service, nor were they asked to leave the store." 89 F.3d at 414.

In *Robertson v. Burger King, Inc.,* 848 F.Supp. 78 (E.D.La.1994), the district court held that an African–American plaintiff had failed to state a claim under 42 U.S.C. § 1981 and 42 U.S.C. § 2000a. Robertson claimed that Burger King had discriminated against him by making him wait to be served, while first serving Caucasian customers who had arrived later. The district court held that slow service was not tantamount to a denial of service, and that Burger King had not violated Robertson's federal civil rights. 848 F.Supp. at 81.

## III. APPLICATION

### A. The Facts

The record establishes the following facts. Steak n Shake is located in Daytona Beach near several bars and nightclubs. The bars and nightclubs close around 2:00 a.m. *See* Docket No. 20. When the bars close, Steak n Shake becomes increasingly busy from 2:00 a.m. to 4:00 a.m. on Saturdays and Sundays. *See* Docket No. 21. Steak n Shake refers to this period as the "bar rush." *See* Docket No. 21. Steak n Shake has customers of many races, but during the bar rush the customers are predominantly African–American (an estimated 75–90%). *See id.* Steak n Shake has a maximum capacity of 100 customers. *See id.* During the bar rush, the number of customers inside Steak n Shake can exceed 150. *See id.* Steak n Shake serves front-counter customers waiting for take-out orders, and has table and drive-through service as well. *See id.* The total

number of customers may reach 700 during the bar rush period. *See id.*

Over time, Steak n Shake has experienced serious problems during the bar rush because of a large number of intoxicated customers. *See* Docket Nos. 21 and 23. Some of the customers have broken windows and destroyed property, attacked and insulted the staff, and have caused general disruption to the on-going business. *See id.* some customers have walked out of Steak n Shake without paying their bills. *See id.* During the bar rush, the police have had to break up fights in Steak n Shake and in its parking lot. *See* Docket Nos. 21 and 22. On September 1, 1996, for example, the crowd inside and outside of Steak n Shake became so unruly that the police ordered Steak n Shake to shut its doors at 3:00 a.m. *See id.*

Steak n Shake does not require prepayment for table service. *See* Docket No. 29. Steak n Shake trains all servers on the "seven steps to service." *See id.* The "seven steps to service" require the server to leave the check at the table just after serving the main course. *See id.* After the customers finish dining, they pay at the cash register on their way out. *See id.*

Due to the problems surrounding the walk-outs during bar rush, Shift Manager Becky Miller ("Miller") raised the issue of prepayment at a September 5, 1996 managers' meeting. *See* Docket Nos. 21 and 24. She suggested that all table service customers prepay their bills at the time the customers placed their orders. *See id.* It is Steak n Shake's policy that all carry-out and drive-through customers, but not table customers, prepay their bill at the time they place their food order. At the September 5, 1996 meeting, General Manager Tim Bomar ("Bomar") denied the request, and directed that the normal table service policy remain in effect. *See* Docket No. 21. However, Bomar agreed that walk-outs were a problem, and said that he would check with his supervisor, District Manager David Bennett ("Bennett"). *See* Docket Nos. 22 and 21.

On September 11, 1996, Bomar attended a General Managers' meeting at which he ad-dressed the problems regarding the bar rush and the number of walk-outs. *See* Docket Nos. 21 and 22. Bennett stated that Steak n Shake should continue with its policy of no prepayment, although he agreed to speak with his Division Manager, Gary Smith ("Smith"). *See id.* On the same day, Bennett spoke with Smith. *See* Docket Nos. 22 and 28. Smith responded that he would not institute a prepayment policy. *See* Docket No. 28. The following day, Bennet advised Bomar that Steak n Shake would continue with its no prepayment policy. *See* Docket Nos. 21 and 22. On September 13, 1996, Bomar informed all of the managers on duty of the response. *See* Docket No. 21.

Bomar also left a note in the managers' log informing all absent managers of the decision. *See* Docket No. 21. Miller was not on duty on September 13, 1996. *See id.* However, Bomar personally informed Miller when she returned to work on the afternoon of September 14, 1996 that no server was to request prepayment from customers dining at the tables. *See* Docket Nos. 21 and 24.

Despite the stated policy, server Roberta Squires ("Squires") asked her customers to prepay for their food during the bar rush early Saturday morning, September 14, 1996. *See* Docket No. 25. The weekend before, Squires had experienced six walk-outs during the bar rush, and was concerned that her position as a food server was in jeopardy. *See* Docket Nos. 25 and 23. On September 14, 1996, Squires asked Manager Tony Jenkins ("Jenkins") to permit Squires to ask customers to prepay during bar rush. *See id.* Jenkins reminded her this was not Steak n Shake's policy, and instructed Squires to not ask for prepayment. *See id.* Squires had earlier learned the "seven steps to service" during training, and knew Steak n Shake's policy. *See* Docket No. 25. Squires ignored Jenkins' directive and asked Miller for permission to request prepayment. *See* Docket No. 24. Shift Manager Miller gave Squires permission to ask for prepayment during the bar rush that day, but states that she emphasized that Squires must ask *all* customers to prepay.[2] *See id.*

---

2. As shift supervisor, Miller is an hourly employ-ee with no express authority to make or alter

In the early morning of September 14, 1996, Squires asked *all* of her customers to prepay during the bar rush. *See* Docket No. 24. She asked both Caucasian and African–American customers during the bar rush to prepay. *See id.* On the same morning, another server, Suzanne Chamblee ("Chamblee") waited on two Caucasian women, Cicely Holman ("Holman") and Laura Stewart ("Stewart") who were regular customers of Steak n Shake. *See* Docket Nos. 26 and 30. Chamblee took their orders before the bar rush commenced. *See* Docket No. 30. Once the bar rushed began, Chamblee went behind the counter to assist with the carry-out customers. *See* Docket No. 26. Chamblee continued to serve Holman and Stewart, her other customers, and the carry-out orders. *See id.* After Chamblee served Holman and Stewart their food and gave them their bill, Squires checked on the two because Chamblee could not leave the counter. *See* Docket No. 26. Chamblee had not asked the two women or any of her seated customers to prepay.[3] *See id.*

Sometime between 2:00 a.m. and 2:30 a.m., Stevens and Harris, along with their friend DeJuana Ellis (all African–Americans), entered[4] Steak n Shake and sat at a table. *See* Docket Nos. 2 and 31, Exhibit 1 at 23 and Exhibit No. 2 at 29. Within five to seven minutes, Squires approached their table to take their order. *See id.* Stevens stated that Squires was neither rude nor unpleasant. *See* Docket No. 31, Exhibit 2 at 35. Shortly thereafter, Squires returned to the table and told the women the total of their bill. *See* Docket No. 31, Exhibit 1 at 34. Stevens asked if Squires wanted them to pay in advance. *See id.* at 35. Squires responded "yes." *See id.* The plaintiffs and Ellis asked for separate checks. *See* Docket No. 31, Exhibit 1 at 35–36 and Exhibit 2 at 36. Squires left two separate the bills. *See id.*

Stevens and Harris did not know that Squires was not Holman's and Stewart's server. *See* Docket No. 31, Exhibit 1 at 35–36 and Exhibit 2 at 39. While Squires was preparing the bills, Stevens and Harris asked Holman and Stewart if they had been asked to prepay their bill. *See* Docket No. 31, Exhibit 1 at 32 and Exhibit 2 at 39–40. Holman and Stewart responded that no one had asked them to prepay. *See* Docket No. 31, Exhibit 1, at 32.

On Squires' return, Stevens asked why they had to prepay. *See* Docket No. 31, Exhibit 1, at 36. Squires responded that it was the policy, and told them about the many walk-outs she had had the weekend before. *See* Docket No. 31, Exhibit 1, at 36 and Exhibit 2, at 47. Squires did not insist that Stevens and Harris prepay, but rather continued to process their food order. *See* Docket No. 25. Stevens then asked for their food to go. *See* Docket No. 31, Exhibit 1, at 41–42.

Stevens also asked to speak with the manager. *See* Docket No. 31, Exhibit 1, at 37. Jenkins, an African–American manager, came out to the table and spoke with Stevens and Harris. *See* Docket No. 31, Exhibit 1, at 40–41.[5] Stevens asked to speak with another manager, but Squires advised them that Jenkins was the only manager on duty. At about 3:00 – 3:15 a.m., Stevens, Harris and Ellis paid for their food and left the Steak n Shake. *See* Docket No. 31, Exhibit 1, at 43–44, 46 and Exhibit 2 at 43 and 48. Stevens and Harris did not hear or see Squires wait

company policy. *See* Docket No. 24.

**3.** Squires did not ask the two women to prepay because by the time she helped with their table, Chamblee had already served them their food and presented them with their check.

**4.** Stevens and Harris state in their complaint and depositions that they arrived at Steak n Shake between 2:00 a.m. and 2:30 a.m., and departed between 3:15 and 3:30 a.m. However, on May 27, 1998, Stevens filed an affidavit stating that she arrived at Steak n Shake between 1:00 a.m. and 2:00 a.m. *See* Docket No. 35. For purposes

of this report and recommendation, Stevens' change in testimony is unimportant.

**5.** At her deposition, Stevens testified that Jenkins responded as follows to Stevens' complaint: "Oh, isn't she [Squires] a trip." In her affidavit opposing Steak n Shake's motion for summary judgment, however, Stevens stated that Jenkins "condoned the practice of requesting us to prepay for our food." Neither the affidavit nor the record as a whole present any other specific evidence as to what Jenkins said or did that created Stevens' impression that Jenkins condoned Squires' act.

on any other table, and do not know whether or not Squires asked all of her customers to prepay. *See* Docket No. 31, Exhibit 1, at 50. The following night, Squires arrived at work, but advised another server that she could no longer handle the late night shift. Squires left, and has never returned to Steak n Shake's employ. *See* Docket No. 25.

On September 16, 1998, Stevens called Steak n Shake and informed Mark Smith that Squires had asked them to prepay for their food. Smith apologized and offered to give them dinner "on the house." *See* Docket Nos. 31, Exhibit 1 at 52, Exhibit 2 at 50 and No. 27. Stevens declined, told Smith that it was okay, and that she did not live in the Daytona Beach area. *See* Docket Nos. 31, Exhibit 1 at 50, 52–53 and No. 27. As Squires had already left Steak n Shake's employ, Smith could not discipline her. *See* Docket No. 21.

Stevens next called the Tampa Division office of Steak n Shake, and spoke with Division Manager Gary Smith. *See* Docket Nos. 31, Exhibit 1 at 50, 54–55 and No. 28. Smith promised to investigate the matter. *See* Docket Nos. 31, Exhibit 1 at 50, 55 and No. 28. Smith called Bennet, who in turn immediately phoned Stevens to apologize, and to advise her that is not Steak n Shake's policy to ask customers to prepay for their food while receiving table service. *See* Docket Nos. 28 and 22. Following the investigation, Steak n Shake disciplined Miller for instructing Squires that she could depart from company policy. *See* Docket Nos. 24 and 22.

## B. Analysis

The parties do not dispute that Steak n Shake is a public food service establishment, a private enterprise that has the right to refuse service to any person who is objectionable or undesirable to the operator. A person may be objectionable or undesirable because he is intoxicated, disruptive, or unwilling or unlikely to pay. The parties also agree that Steak n Shake may not refuse service based on race or color, and that Stevens and Harris are entitled to the full and equal enjoyment of the services of Steak n Shake without discrimination on the ground of race or color. Stevens and Harris are African–Americans, members of a protected class. The parties agree that Florida law confers a right of action for damages on any person who is refused service based on race or color.

Nevertheless, Stevens and Harris have failed to establish a *prima facie* case of discrimination under Fla.Stat. § 509.092. Specifically, Stevens and Harris have not proved 1.) that Steak n Shake intended to discriminate against them based on their race or color; and 2.) that Steak n Shake refused to serve them, or otherwise denied them the full and equal enjoyment of Steak n Shake's services because of their race or color. The district court should grant summary judgment for defendant Steak n Shake.

Steak n Shake's policy was *not* to discriminate based on race or color, and *not* to ask any table customer to prepay. Although the record shows that a Steak n Shake waitress (Squires) and a supervisor (Miller) acted contrary to company policy and company intent in asking Stevens and Harris to prepay their meal while seated at a table, nothing in the record allows an inference that Squires, Miller, or Steak n Shake intended to discriminate.

Similarly, nothing in the record allows a reasonable inference that the request for prepayment in the early morning of April 14, 1996 in fact was because of race. On the contrary, the waitress (Squires) testified that she asked *all* of her customers to prepay during the bar rush that day. Squires knew that she was violating Steak n Shake policy, but nevertheless requested prepayment because she feared for the security of her job after all of the walk-outs during bar rush the weekend before. The supervisor (Miller) stated in her affidavit that she gave Squires permission to ask *all* of her customers to prepay during the bar rush.

Stevens and Harris have not shown that Steak n Shake treated them any differently than similarly situated non-protected customers. Proof that another waitress (Chamblee) at another server station did comply with company policy, and did not require prepayment from two white customers at another table, falls far short of proving race discrimi-

 

nation. It would be unreasonable to infer racial discrimination from that fact, without more. Neither Steak n Shake's company policy, nor the waitress' and supervisor's request for prepayment, treated races unequally.

 Similarly, Stevens and Harris have failed to produce evidence that Steak n Shake refused to serve them because of race or color. Although Squires asked Harris and Stevens to prepay, she served them even when they refused to pay in advance. Just like slow service without racial discrimination is not tantamount to a denial of service, service contingent on prepayment without racial discrimination is not tantamount to a refusal of service.[6] Similarly, Stevens and Harris have failed to prove that Steak n Shake denied them the full and equal enjoyment of Steak n Shake's services *because of their race or color.* There is no evidence that Squires asked for prepayment because of their race or color. Squires did not treat Harris and Stevens differently from how Squires treated other patrons.

## IV. CONCLUSION

Even with the benefit of all *reasonable* inferences drawn from the record, Stevens and Harris have not established that Steak n Shake intended to discriminate or actually discriminated based on race or color. As a matter of Florida law, Stevens and Harris have not proved that Steak n Shake violated their civil rights. It is therefore **RECOMMENDED** that defendant Steak n Shake's motion for summary judgment [Docket No. 18] be **GRANTED**.

Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 6.02 within ten days of the date of its filing shall bar an aggrieved party from a de novo determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.

---

**6.** In contrast, slow service *based on race,* and service that is contingent on prepayment *based on race,* is tantamount to a denial of service or a refusal to serve. Such racially-based discrimination in service would not only be unconscionable, but also would be actionable as a denial of full and equal enjoyment of the restaurant's services based on race as proscribed by Fla.Stat. § 509.092.