Avis E. BUCHANAN, et al.

v.

CONSOLIDATED STORES CORP.

No. CIV.A. 99–3736.

United States District Court,
D. Maryland.

Jan. 4, 2001.

Edward J. Reed, Baach, Robinson & Lewis, Washington, DC, for Avis E. Buchanan, Carolyn Kornegay–Belton.

John P. Relman, Relman & Associates, Washington, DC, Christine Robitscher Ladd, Relman & Associates, Washington, DC, Edward J. Reed, Baach, Robinson & Lewis, Washington, DC, Elizabeth S. Westfall, Relman & Associates, Washington, DC, for Equal Rights Center.

R. Michael Smith, Dechert, Price & Rhoads, Washington, DC, for Consolidated Stores Corp.

John P. Relman, Relman & Associates, Washington, DC, Christine Robitscher Ladd, Relman & Associates, Washington, DC, Edward J. Reed, Baach, Robinson & Lewis, Washington, DC, for Albert R. Conley, Ardelia Crawford, Yvette D. Tate.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Pending before the court and ready for resolution is the motion to dismiss of Defendant Consolidated Stores Corp. ("Consolidated" or "KB Toys"). No hearing is deemed necessary, and the court now rules pursuant to Local Rule 105.6. For the reasons that follow, the court shall grant the motion in part and deny it in part.

### I. Background

Plaintiffs are five individuals, Avis E. Buchanan, Albert R. Conley, Ardelia Crawford, Carolyn Kornegay–Belton and Yvette D. Tate, and a non-profit organization, the Equal Rights Center ("ERC")[1]. Defendant Consolidated Stores Corp. is a Delaware corporation that controls or owns several hundred KB Toys stores across the country. Plaintiffs allege that KB Toys discriminated against the five individual plaintiffs when several stores owned by Defendant and located in predominately African–American neighborhoods in Maryland refused to accept Plaintiffs' checks to pay for merchandise. The individual Plaintiffs recount similar stories.

On separate occasions, Crawford, Kornegay–Belton and Tate attempted to purchase by check gifts at the KB Toys at Iverson Mall in Temple Hills, but were told that the store did not accept checks. In July 1999, Crawford asked to see the

---

1. According to Plaintiffs' Amended Complaint, ERC's mission is to promote civil rights issues and encourage a society where equal opportunity is available for all of society. The group's mission is to further "fair housing, fair employment, public accommodations and other civil rights issues." To do so, ERC offers such programs as education and outreach, diversity training, research, and planning initiatives. Paper no. 5, ¶ 12.

manager about the no-check policy as she previously had paid for items by check at KB Toys in Waldorf, Maryland and Falls Church, Virginia. In response to her inquiry concerning the no-check policy, the manager, an African–American, told her "you know how we are; we write bad checks." Upset, Crawford left without buying the items.

In December 1997, Kornegay–Belton was similarly told by the cashier that the store did not accept checks. She bought the items she wanted anyway. In December 1999 while working with ERC, Kornegay–Belton learned that ERC was investigating KB Toys no-check policy and told her supervisor that she had earlier been a victim of the policy.

In November 1998, Tate also was told by a cashier at the Temple Hills store that she could not pay for her merchandise by check. Tate, who nevertheless completed her purchase, claims that she previously had paid by check at KB Toys in Bowie, Maryland and Arlington, Virginia. Moreover, a day after Tate's incident at the Temple Hills store, she purchased items by check at the KB Toys at Pentagon City in Virginia.

Dr. Conley attempted to purchase a video game for his sons in July 1999 at KB Toys in Prince George's Plaza and was told by a cashier that the store did not accept checks. Concerned about the matter, he asked to see the manager, who explained to him that because the store had been receiving bad checks, his superiors decided that checks would no longer be accepted there. The manager also told him that stores in Landover and Silver Spring did not accept checks either. Dr. Conley purchased the video game by credit card.

In November 1999, Buchanan attempted to make a purchase by check at the KB Toys in Forest Village Park Mall in For-estville, Maryland and was told by the cashier that that particular store did not accept checks. Buchanan used her credit card to buy the items she wanted. Suspecting that she had been the victim of unlawful discrimination, Buchanan called ERC the next day and asked the center to investigate KB Toys no-checks policy.

Following Buchanan's call, ERC conducted tests by telephone and in person and claims it uncovered "a pattern and practice of discrimination against African Americans . . . ." Paper no. 5, ¶ 47. ERC asked members of its staff to shop at various KB Toys. According to ERC, the tests uncovered that KB Toys located in areas with a predominately African American population did not accept checks from any of its customers while stores located in predominantly white areas would accept checks.[2] Plaintiffs claim that Defendant "knows the racial composition of the geographic areas in which its stores are located and has determined the race of the customers most likely to frequent each of its stores . . . and intentionally instituted a 'no-checks' policy in those stores . . . where the customers are most likely to be African–Americans." *Id.* at 13. Plaintiffs also assert that Defendant "instituted its no-check policy" with the "intent to discriminate against African–Americans." *Id.* The individual plaintiffs claim that as a result of the no-check policy they have suffered economic loss, humiliation, embarrassment, and mental and emotional distress. ERC claims that it has suffered injury, among other things, by "expending significant resources," in terms of both money and staff time to investigate the discrimination claims and because the no-check policy has frustrated its mission of ridding the Washington–Baltimore metropolitan area of discrimination based on race. Paper no. 10 at 12–13.

---

**2.** Plaintiffs allege that checks are not accepted at the following KB Toys: (1) Forest Village Park Mall in Forestville; (2) Prince George's Plaza in Hyattsville; (3) Laurel Center in Laurel; (4) Iverson Mall in Temple Hills; (5) Beltway Center in Greenbelt; (6) Mondawmin Mall in Baltimore; (7) Reisterstown Road Plaza in Baltimore; and (8) City Place in Silver Spring. Paper no. 5, ¶ 48.

Plaintiffs filed this action alleging discrimination under 42 U.S.C. § 1981. Plaintiffs also seek class action status, pursuant to Fed.R.Civ.P. 23(a), (b)(2), (b)(3). Defendant's motion asserts that the individual Plaintiffs fail to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), and that, because ERC lacks standing, this court lacks subject matter jurisdiction over its claim, Fed.R.Civ.P. 12(b)(1).

## II. Analysis

### A. Individual Plaintiffs' § 1981 claim

■ A Rule 12(b)(6) challenge requires a court to accept all well-pled allegations of the complaint as true and to construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir.1997). Such a motion ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court, however, need not accept unsupported legal allegations, *Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir.1989), or conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir.1979). Nevertheless, neither vagueness nor lack of detail is a sufficient ground on which to grant a motion to dismiss. *Hill v. Shell Oil Co.,* 78 F.Supp.2d 764, 775 (N.D.Ill.1999) (quoting *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985)).

■ Section 1981, in pertinent part, states:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, . . . as is enjoyed by white citizens . . . .

(b) . . . the term "make and enforce contracts" includes the making, perfor-

mance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

Most § 1981 actions involve employment discrimination claims, and courts analyze such cases employing the same statutory scheme used in cases brought under Title VII. *Hawkins v. Pepsico, Inc.,* 203 F.3d 274, 278 (4th Cir.2000); *Gairola v. Commonwealth of Virginia Dept. of Gen. Serv.,* 753 F.2d 1281, 1285–86 (4th Cir.1985) (citations omitted). Discrimination claims involving retail transactions have been far more rare. *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir.1996). However, when faced with such claims, courts generally employ a three-prong test to analyze them. To state a cause of action in a § 1981 action like the one presently before the court, a plaintiff must show: (1) he or she is a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities protected by the statute. *Hill,* 78 F.Supp.2d at 776; *Bobbitt v. Rage Inc.,* 19 F.Supp.2d 512, 517 (W.D.N.C.1998) (citing cases using this standard from the Second, Fifth, Seventh and Eleventh circuits).

■ All individual plaintiffs are African American and thus satisfy prong one of the prima facie case. Defendant's primary argument concerns prong two. Defendant argues that Plaintiffs cannot show intentional discrimination, and at most allege facts sufficient to show only disproportionate impact. Paper no. 7 at 11. The court disagrees. Plaintiffs allege that Defendant knew the racial composition of its stores, determined the race of customers most likely to patronize particular stores, and based on the race of the predominant clientele at those stores, African American, instituted the no-check policy. Paper no. 5, ¶¶ 50–51. Under the standard applicable to a motion to dismiss, Plaintiffs have alleged sufficient facts to support a claim of intentional discrimination. *See Hill,* 78 F.Supp.2d at 775 ("[M]ere vagueness or

lack of detail does not constitute sufficient grounds for a motion dismiss.") (citation omitted). Proof, of course, must follow if Plaintiffs are to succeed ultimately.[3]

■ With respect to the third prong, Defendant argues that because all patrons had the opportunity to make their purchases, there was no interference with the right to contract. Paper no. 7 at 13 ("[A]ll of the individual Plaintiffs had the opportunity to complete their purchases in a timely manner despite the no-check policy."). Indeed, despite their protests, all of the individual plaintiffs, except Crawford, bought the items they intended to buy. Moreover, Crawford has not alleged that she did not have the opportunity to make her purchases; she chose not to do so. To that end, Defendant claims that Plaintiffs assert no more than a "minor inconvenience" because of the no-check policy at select stores. *Id.* at 14. The court again disagrees.

The fact that purchases were made is not dispositive of the third prong. Courts have allowed § 1981 claims to proceed even though a plaintiff was allowed to complete his or her sales transaction or contract with the defendant. *Hill*, 78 F.Supp.2d at 776–77 (holding that black plaintiffs who purchased gasoline stated a cause of action under § 1981, where defendants forced them but not white patrons to prepay); *Bobbitt*, 19 F.Supp.2d at 519 (denying motion to dismiss in a § 1981 action, where plaintiffs were allowed to purchase a pizza but, unlike other customers, were forced to prepay for it); *McCaleb v. Pizza Hut of America, Inc.*, 28 F.Supp.2d 1043, 1047–48 (N.D.Ill.1998) (refusing to dismiss § 1981 claim, where although plaintiffs were allowed to purchase pizza, defendants failed to provide them with the full benefits of the contractual relationship by ne-

glecting to furnish utensils and creating a disturbing atmosphere in which to eat).

In *Morris*, two African American men brought claims against Defendant retailer after a manager called police and reported that the men were acting suspiciously. 89 F.3d at 411. Holding that the men failed to state a claim under § 1981, the Seventh Circuit noted that they were deprived of no rights under the statute. *Id.* at 414 ("They were denied neither admittance nor service, nor were they asked to leave the store.").

As the district court in *Hill* makes clear, however, the manager in *Morris* placed no "special condition on the plaintiffs' contractual relations or right to make purchases." *Hill*, 78 F.Supp.2d at 777. In contrast, the black plaintiffs in *Hill* were made to do something different than white customers to purchase gasoline—prepay—and that alone implicated § 1981. The court found that the plaintiffs stated a cause of action by alleging that the "racially discriminatory prepay requirement adversely affected the basic terms and conditions of their contract to purchase gasoline." *Id.* "The discrimination took place at the point of sale, directly implicating plaintiffs' right to contract and to enjoy 'all benefits, privileges, terms and conditions of the contractual relationship.'" *Id.* (quoting 42 U.S.C. § 1981(b)).

There is no discernable difference between this case and *Hill* with respect to the third prong of Plaintiffs' prima facie case. In both, the African–American plaintiffs were allowed to purchase the item(s) they wanted. In both, and unlike in *Morris*, the defendants placed a special condition on Plaintiffs' right to contract. *Cf. Bobbitt*, 19 F.Supp.2d at 519 (§ 1981 contract right implicated when, based on race, plaintiff was asked to do something different than other customers, i.e., pre-

---

**3.** *See e.g., Stevens v. Steak n Shake, Inc.,* 35 F.Supp.2d 882, 890–91 (M.D.Fla.1998) (granting summary judgment in favor of defendant restaurant, where waitress requested that all customers, black and white, prepay for meals; African–American plaintiffs presented no evidence of intent to discriminate or that race was the reason for the prepayment request).

pay, to complete a purchase). Further, both sets of plaintiffs alleged that the respective defendants' discriminatory policies adversely affected the basic terms and conditions of their contract to purchase merchandise. *Id.; see* Paper no. 5, ¶ 56 (Defendant's no-check policy prevents African–American customers from making and enforcing contracts on the same basis as whites); *see also* § 1981(b) (make and enforce contract "includes the . . . enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."). The alleged discriminatory special condition imposed by Defendant in this case—the no-check policy—is not significantly different from those imposed by other defendants, such as a prepay requirement.[4] Accordingly, Plaintiffs state a cause of action for discrimination under § 1981, and Defendant's Rule 12(b)(6) motion is denied.

## B. ERC standing

 There are two ways to present a 12(b)(1) motion to dismiss. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). A defendant may either contend (1) that the complaint fails to allege facts upon which subject matter can be based, or (2) that the jurisdictional facts alleged in the complaint are untrue. *Id.* If, as in the case now before the court, a defendant raises the first argument, then the allegations in the complaint are assumed to be true, and the court will view the motion as it would one brought under 12(b)(6). *Id.; Higgins v. United States*, 894 F.Supp. 232, 234 (M.D.N.C.1995).

Defendant moves to dismiss ERC as a plaintiff for lack of standing. ERC argues that its injuries are indistinguishable from those sustained by non-profit organizations in fair housing cases, in which courts have held that such organizations have standing to bring suit. Thus, ERC argues that it satisfies Article III standing requirements. The court disagrees.

 To assert standing successfully under Article III, a plaintiff must show (1) actual or threatened injury that is both concrete and particularized, and not conjectural or hypothetical; (2) injury fairly traceable to the defendant's challenged action; and (3) injury likely redressable by a favorable court decision. *Burke v. City of Charleston*, 139 F.3d 401, 405 (4th Cir. 1998) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). An organization may show standing to bring a suit under two theories: standing in its own right or representational standing, based on the fact that members it represents have been harmed. *Maryland Highways Contractors Ass'n., Inc. v. State of Maryland*, 933 F.2d 1246, 1250 (4th Cir.1991) (citations omitted). ERC asserts that it has standing in its own right to bring this suit and thus must satisfy the three-prong test discussed above.

*Havens Realty Corporation v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), is the seminal case regarding organizational standing, at least under the Fair Housing Act ("FHA"). In that case, the Court stated:

---

**4.** Defendant points to cases that suggest that offering different services in different communities of disparate racial composition is insufficient to state a claim under § 1981. The case most analogous to the one now before the court is *Bailey v. Jewel Companies, Inc.*, 1979 U.S. Dist. Lexis, 9193 (N.D.Ill. Oct. 12, 1979). In *Bailey*, the court granted the defendant's motion to dismiss, holding that a retailer offering different check cashing services in different communities did not violate § 1981. On a preliminary note, *Bailey* is a 22–year old unpublished decision. Moreover, *Bailey* pre-

dates the statutory changes to § 1981, which added subsection (b) and expanded the scope of the statute's protections. Further, as Plaintiffs indicate, that case is silent as to the nature of Bailey's claim. While he apparently argued that the defendant's check cashing policies differed according to neighborhood, it is unclear whether he alleged that no checks at all were accepted in parts of the city that were primarily African American. Thus, there is no way to tell whether the defendant in that case infringed upon Bailey's right to make or enforce a contract.

.If, as broadly alleged, petitioner's steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests . . . .

*Id.* at 379, 102 S.Ct. 1114.

■ ERC claims that it has been injured because it spent money investigating the Defendant's alleged discriminatory practices and because in doing so it diverted resources from its "usual testing, education, counseling, and referral services." Paper no. 5, ¶ 60; paper no. 10 at 27. ERC appears to allege that it suffered injury as a result of having to divert its resources from its other programs to investigate Defendant's alleged discrimination. At least one court of appeals has questioned whether such self-inflicted injury is sufficient to constitute injury in fact for purposes of Article III standing. *Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268 (D.C.Cir.1994). In *BMC*, the plaintiff's goal included promoting equal opportunity in employment. To accomplish its goals, the plaintiff provided outreach, counseling and education services. *Id.* at 409. The court found that, to the extent the Council's programs were harmed because of the defendant's discrimination, the Council had alleged sufficient injury. Providing examples of the types of injuries the Council could have sustained because of BMC's discrimination, the court noted that more people in the area might need counseling or BMC's discrimination might increase the number of unemployed minorities in the area, hampering the Council's

outreach programs. *Id.* at 409. The court was clear, however, that simply alleging that it spent money to test or challenge alleged discrimination did not support standing. "One can hardly say that BMC has injured the Council merely because the Council has decided that its money would be better spent testing [the discriminatory practices of] BMC than by counseling or researching."[5] *Id.* at 410. The court finds this reasoning persuasive. It does not appear from the papers that KB Toys' no-check policy had any concrete effect on any of ERC's programs. Further, ERC chose to investigate Defendant's policy and in some cases did so by simply calling the stores. ERC cannot now claim that because it chose to channel its funds this way, Defendant's no-check policy has caused it injury in fact sufficient to satisfy Article III standing requirements.

■ Aside from diverting its resources from some programs to investigate Defendant's alleged discrimination, ERC also claims that its mission to eliminate discrimination in the Washington–Baltimore metropolitan area was frustrated. ERC asserts that its mission has been harmed by KB Toys' policy of denying "a basic and fundamental economic freedom to scores of people who attempted to pay by check in KB Toys stores with predominantly African–American clientele." Paper no. 10 at 28. Such an injury falls far short of that asserted in either *Havens* or *BMC*, where not only were the organizations' programs themselves allegedly harmed by the defendants' actions but also the defendants' alleged illegal actions were "at loggerheads with the plaintiffs' stated mission." *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1429–30 (D.C.Cir.1996). As the court in *National Treasury* held "conflict between a defendant's conduct and organization's mission

---

5. *But see City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1095 (7th Cir.1992) ("[T]he only injury which need be shown to confer standing on a fair-housing

agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination.") (citations omitted).

is alone insufficient to establish Article III standing." *Id.*

The injury ERC asserts seems nothing more than a set back to an "abstract social interest," i.e., eliminating societal racial discrimination, which is insufficient to support Article III standing. *Havens*, 455 U.S. at 379, 102 S.Ct. 1114 (citing *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Cases cited by ERC to support its assertion to the contrary are unavailing. In *Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C.Cir. 1990), for example, the court noted that in their complaint, plaintiffs "crucially alleged" that the defendants' actions " 'interfered with plaintiff FHC and MWPHA's efforts and programs intended to bring about equality of opportunity for minorities and others in housing' and required plaintiffs 'to devote scarce resources to identify and counteract defendants' advertising practices.' " *Id.* at 28. By contrast, ERC does not claim specific harm to its programs or efforts but rather that KB Toys' no check policy has frustrated its mission "to eliminate discrimination on the basis of race or color in the Washington–Baltimore Metropolitan Area and injured . . . the right of the Center's constituents to enjoy the benefits of living in a society where people are treated equally and without regard to their race or color." Paper no. 5, ¶ 60. Such an injury is simply too abstract to support Article III standing.

■ Moreover, were the court to find sufficient injury for purposes of Article III, prudential limits would bar standing in this case. Courts impose prudential standing requirements to "add to the constitutional minima a healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed, the claim not be an abstract, generalized grievance that the courts are neither well equipped nor well advised to adjudicate." *Burke*, 139 F.3d at 405 (quoting *Secretary of State of Maryland v. Joseph H. Munson, Inc.*, 467 U.S. 947, 955 n. 5, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984)). Prudential considerations preclude a court from deciding "questions of broad social import in cases in which no individual rights will be vindicated, and access to the federal courts should be limited to those litigants best suited to assert the claims." *Mackey v. Nationwide Insurance Co.*, 724 F.2d 419, 422 (4th Cir. 1984) (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)). Moreover, prudential safeguards should be imposed against a litigant, whether person or organization, asserting the rights of another, unless the litigant is the only "effective adversary of the unlawful discrimination." *Id.* at 422 (citing cases in which white plaintiffs were allowed to assert § 1981 actions as blacks were denied access to the housing or areas in question, and thus the chance that a black plaintiff would have the opportunity to assert a claim on his or her behalf was tenuous).

■ It is now well-settled that the prudential barriers do not apply to discrimination claims brought under the FHA. *Havens*, 455 U.S. at 372, 102 S.Ct. 1114. Unlike *Havens*, which dealt with the FHA, this case deals with a discriminatory claim brought under § 1981, which, despite ERC's lengthy arguments to the contrary, is subject to prudential limitations. *BMC*, 28 F.3d at 1277–79 (holding that while a non-profit organization had standing under Article III to bring a § 1981 claim, prudential standing limitations barred the suit); *Maryland Minority Contractor's Assn., Inc. v. Maryland Stadium Authority*, 70 F.Supp.2d 580, 588 (D.Md.1998) (citations omitted).

The Fourth Circuit addressed prudential considerations to standing in *Mackey*. In that case, an insurance agent brought a § 1981 action against an insurer, alleging he suffered harm because the insurer practiced redlining in neighborhoods in which Mackey wanted to sell or renew insurance to black homeowners. *Id.*, 724 F.2d at 420. Determining that the plaintiff lacked standing, the court held that

while homeowners in those neighborhoods in which the insurer refused to insure houses may have had standing to sue, prudential limitations prevented standing with respect to the agent. *Id.* at 421. The court found that "no impediment [existed] to actions by those blacks who were denied property insurance because of the alleged discriminatory practice." *Id.* In short, Mackey was not the only means by which the proper plaintiffs could have their rights vindicated. Thus, granting standing to Mackey was unwarranted.

ERC argues that this court should decline to apply prudential limits to it because its testing and investigative program brought Defendant's alleged discrimination to light and even caused some of the individual Plaintiffs to come forward. Further, it argues that the individual Plaintiffs would have been ill-equipped to conduct such an investigation without its help. These arguments do not support ERC's position because, as Defendant notes, helping a plaintiff to acquire information to bring a lawsuit does not confer standing. Nothing bars the individual plaintiffs or anyone else directly harmed by Defendant's policy from proceeding with this action. ERC also asserts that it must be a party to this action because, whether or not the court certifies the class, only ERC is in a position to oversee and administer any award. The court disagrees and finds that if necessary, a proper remedy may be afforded to any plaintiffs actually injured by Defendant's practices without ERC as a party.

### III. Conclusion

For the foregoing reasons, Defendant's motion is denied in part as to the individual Plaintiffs, for failure to state a claim, and granted in part as to ERC, for lack of standing.

A separate Order will be entered.