732 A.2d 569 (1999)
Katherine STYLES, Plaintiff,
v.
The TOWNSHIP OF GALLOWAY, Defendant.
Superior Court of New Jersey, Law Division, Atlantic County.
Decided March 12, 1999.
Richard A. Carlucci, Ocean City, for plaintiff (Griffith and Carlucci, attorneys).
*570 James F. Ferguson, Absecon, for defendant (Law Offices of Roger C. Steedle, attorneys).
WILLIAMS, A.J.S.C.
This case involves a dispute over the length of the mayor's term of office in a Faulkner Act Council-Manager Plan municipality.
The essential facts are not in dispute. On November 5, 1974, the voters of Galloway Township adopted the Faulkner Act Council-Manager Plan E form of government. N.J.S.A. 40:69A-114.1 to 40:69A-114.4 (repealed 1982). That Plan provided for a township council consisting of seven persons elected at large in partisan elections for staggered four-year terms. The mayor is elected by the council from among its members.
The first election for Township Council under the new form of government occurred in November 1975. Thereafter, on January 1, 1976, at its initial organizational meeting, the Township Council selected a mayor. Since that time, the Council has conducted reorganization meetings on January 1 of each year and has selected a mayor to serve until the next year's meeting. In February 1990, the Council adopted an Administrative Code which, in pertinent part, codified the practice of selection of a mayor for a one-year term at the annual reorganization meeting on January 1. See Galloway Tp. Admin. Code, art. II, § 2-5(A).
The most recent election for council members occurred on November 4, 1997, at which time the voters elected four council members. Three other council members elected two years earlier continued in office. At its reorganization meeting on January 1, 1998, following the election, the Township Council selected Theresa Conover as the mayor. In September of that year, Mayor Conover died. On or about October 5, 1998, a replacement was selected to fill her vacant council seat and on October 13, 1998, the Council selected the plaintiff to fill the balance of Theresa Conover's unexpired term as mayor.
Following past practice, the Township Council convened on January 1, 1999, for its annual reorganization meeting. At that meeting, Councilman John Kelley was nominated for the position of mayor and was elected by the other council members in a 5-0 vote. Plaintiff abstained from voting, asserting that the annual mayoral selection was in conflict with the Faulkner Act. Thereafter plaintiff initiated this action to challenge Council's selection of Kelley as mayor and to have herself declared the lawful holder of that position. The suit also seeks to void the Township's Administrative Code provisions calling for an annual election of the mayor by council.
Plaintiff asserts that council may elect a mayor only at its meeting on the first day of January following an election for members of council. In this case, that would have been the council meeting of January 1, 1998, when Mayor Conover was elected. She relies upon N.J.S.A. 40:69A-86, which provides in pertinent part:
Any municipality adopting a council-manager plan of government shall provide in its charter ...:
a. That the mayor shall be elected by the members of the council; in which case on the first day of July or January, as appropriate, following their election, the members-elect of the municipal council shall assemble at the usual place of meeting of the governing body of the municipality and organize and elect one of their number as mayor. The mayor shall be chosen by ballot by majority vote of all members of the municipal council.
The original version of this statute was adopted in 1950 as Section 9-6 of Article 9 of the Faulkner Act. L. 1950, c. 210. The Faulkner Act, formally known as the Optional Municipal Charter Law, N.J.S.A. 40:69A-1 to -210, was adopted in response to the Second Report of the State of New Jersey Commission on Municipal Government. The purpose of the Act was "to *571 confer the greatest possible power of local self-government, consistent with the New Jersey Constitution, upon municipalities adopting a plan pursuant to the Act, as well as, to reduce the vast number and types of local government with all their varying rules and regulations, by providing a flexible general pattern adaptable to the various communities and their needs." Newark v. Dept. of Civil Service, 68 N.J.Super. 416, 425, 172 A.2d 681 (App. Div.1961); Mentus v. Irvington, 79 N.J.Super. 465, 470, 191 A.2d 806 (Law Div.1963). To achieve that purpose, the Faulkner Act provided for three distinct forms of municipal government. Municipalities could adopt either a Mayor-Council, Council-Manager, or Small Municipality plan. Within each form of municipal government were a number of options including election on a partisan or non-partisan basis, elections at large or by wards, and the use of concurrent or staggered terms for members of council.
The Faulkner Act initially created four variations of Council-Manager plans (called Plans A, B, C and D). The various plans represented differing combinations of the options available under the Act. Each called for nonpartisan elections in May. Plans A and B called for at large elections, while Plans C and D called for a combination of election by wards and at large. Plans A and C called for concurrent four-year terms, whereas Plans B and D called for staggered four-year terms. In 1953, the Legislature supplemented the variations under the Council-Manager form by providing for Council-Manager Plan E. L. 1953, c. 254. That plan called for partisan elections with members of council being elected at large for staggered four-year terms. The Council-Manager variations were increased with the addition of Plan F in 1973 which called for partisan elections, staggered terms, and selection of council members both at large and by wards. L. 1973, c. 234.
In 1981, the various letter plans of Council-Manager government (Plans A through F) were abolished and consolidated into a single form of Council-Manager government under a revised Article 9. L. 1981, c. 465. The amendments however, did not affect municipalities such as Galloway Township which had adopted its plan of government prior to the effective date of the repealer. N.J.S.A. 40:69A-208.2
As initially adopted, the Faulkner Act established the various Council-Manager plans in Articles 9 through 12. Article 9 created Council-Manager Plan A. Section 9-6 of that Article provided:
On the first day of July following their election, the members elect of the municipal council shall assemble at the usual place of meeting of the governing body of the municipality and organize and elect one of their number as mayor. The mayor shall be chosen by ballot by majority vote of all members of the municipal council.
Section 9-6 is the only place in the Faulkner Act where mayoral selection under the various Council-Manager plans is explicitly addressed. Articles 10, 11 and 12 of the Faulkner Act, establishing Plans B, C, and D, respectively, did not explicitly address issues concerning mayoral selection. Instead, each incorporated by reference the provisions of Section 9-6. In a similar fashion, Plans E and F also incorporated this section by reference with the exception that each provided "that the council shall organize and elect a mayor on January 1 rather than July 1 as provided in Section 9-6." L. 1953, c. 254, § 12A-1; L. 1973, c. 234, § 12B-1.
Defendant's first argument relates to the amendment creating Plan E and its reference to the January 1 date. It asserts that the reference to January 1 in Plan E evidences an explicit legislative intent that there be annual elections for mayor on that date. The legislative history, however, suggests otherwise. The amendment creating Plan E was initially introduced in the Legislature in 1953 as Assembly Bill 41. The sponsor's statement *572 indicating the purpose of the Bill provided:
This bill would make certain technical improvements in the optional municipal charter law, and would add a new option of partisan elections in November under the Council-Manager Plan.

[A. 41, introduced March 16, 1953.] Identical language referring to January 1 was included in the legislation creating Plan F. L. 1973, c. 234. A more detailed but substantially similar statement was included as part of the Assembly Bill which led to the creation of that Plan. That statement provided:
Assembly Bill No. 1038 amends the "Optional Municipal Charter Law" so as to provide a further option under the council-manager forms of government (C. 40:69A-81 et seq.).
Council-Manager Plan F, as provided for in this bill, acts as a complement to Council-Manager Plan E, which, in contrast to the non-partisan nature of the other council-manager plans, permits the holding of politically partisan (November) elections (see R.W. 19:1-3 and C. 40:69A-155).
Standing much in the same relation as Mayor-Council Plan F to Plan E of the Optional Municipal Charter Law, Council-Manager Plan F allows for at-large and ward, partisan elections as an alternative to the exclusively at-large, partisan elections set forth in Council-Manager Plan E.
The amending of other sections of the Optional Municipal Charter Law by this bill is designed to make the charter law internally consistent with the substantive provisions of this bill.

[A. 1038, introduced April 12, 1972.]
The clear legislative intent was to create a Council-Manager plan option for partisan elections. There is absolutely no indication that the reference to elections on January 1 was intended to change the term of office of the mayor from that established in the non-partisan Council-Manager options. Had the Legislature intended to establish an annual election for mayor under Plans E and F, it could easily have so stated. It is clear that the reference to January 1 instead of July 1 was necessitated solely by the fact that Plans E and F called for partisan elections, which would be held in November, whereas Plans A, B, C and D called for non-partisan elections in May. Defendant's argument on this point is unpersuasive.
Nothing in the Faulkner Act provides any date for selection of the mayor other than July 1 or January 1 following an election. However, certain language in Section 9-6 which clearly applies in the cases of Plans A and C, where council terms are concurrent, is somewhat ambiguous when referring to Plans B, D, E and F, where council terms are staggered.
The difficulty is caused by the use of the words "members" and "members elect." The first sentence of 9-6, as applicable to Plan E, requires that on the first day of January following their election, "the members elect of the municipal council shall assemble ... and organize and elect one of their number as mayor ." However, the second sentence provides that "the mayor shall be chosen by ballot by majority vote of all members of the municipal council." Where elections are for concurrent four-year terms, as in Plan A or C, these two sentences can be seen to complement one another. All "members" and "members elect" who assemble on January 1 following the election would be the same persons. Where elections are for staggered terms, however, these sentences, if taken literally, would appear to be at odds with each other since the "members elect" assembling on January 1 following an election would not necessarily include all "members" of council.
Plaintiff asserts that the court should construe the terms "members elect" and "members" as synonymous, thereby yielding a result which would make sense of Section 9-6 and provide for a continuous *573 and consistent process for mayoral selection applicable to all Council-Manager plans. The mayor would be selected from among the council members, by the council members on January 1 or July 1 following each election. In Plans A and C, the mayor would therefore serve a four-year term, while in Plans B, D, E and F, the mayoral selection would occur every two years.
Defendant asserts, however, that Section 9-6 does not apply to the present selection of a mayor by the Galloway Township Council. It asserts that insofar as Section 9-6 sets a date for selection of a mayor, it applies only to Plan A and Plan C municipalities. It urges that the terms "members" and "members elect" are separate and distinct from each other. As such, it argues that Section 9-6 applies to Plan E (as well as Plan B, D and F) municipalities, only with respect to the initial organizational meeting of council after a municipality has opted for a new Council-Manager plan. That, it argues, is the only time when a July or January meeting following an election could occur where the assembled "members elect" would also include all "members" of council. They assert, therefore, that the provisions of Sections 9-6 are applicable to Galloway Township only for the initial Plan E organizational meeting on January 1, 1976, and that thereafter, the municipality has been and is free to determine when and with what frequency it will choose its mayor.
The issue is one that requires interpretation of the statute by the court. It is axiomatic that in construing a statute, the role of the court is to give effect to the intention of the Legislature. State v. Maguire, 84 N.J. 508, 515, 423 A.2d 294 (1980); AMN, Inc. v. So. Bruns. Tp. Rent Leveling Bd., 93 N.J. 518, 525, 461 A.2d 1138 (1983); Merin v. Maglaki, 126 N.J. 430, 436, 599 A.2d 1256 (1992). Our courts have held that legislative intent may be implied from the language of a statute or inferred on grounds of policy or reasonableness. Shapiro v. Essex Co. Freeholders Bd., 177 N.J.Super. 87, 93, 424 A.2d 1203 (1980); Franklin Estates, Inc. v. Edison Tp., 142N.J.Super. 179, 184, 361 A.2d 53 (App.Div.1976), aff'd, 73 N.J. 462, 375 A.2d 658 (1977); Harvey v. Essex County Board of Freeholders, 30 N.J. 381, 392, 153 A.2d 10 (1959). In this regard, statutes are to be read sensibly rather than literally, and the controlling legislative intent is to be presumed as consonant to reason and good discretion. Roig v. Kelsey, 135 N.J. 500, 515, 641 A.2d 248 (1994). Courts should avoid interpreting a statute in a manner that leads to an absurd, anomalous, or unreasonable result. Rather, statutory interpretations should turn on the breadth of the legislative objectives and the common sense of the situation. Cty. of Camden v. S. Jersey Port, 312 N.J.Super. 387, 396, 711 A.2d 978 (App.Div.1998). In seeking to discern legislative intent, our courts have recognized that words are inexact tools at best and that the obligation of the court is to ascertain the true sense and meaning of the statutory language used. Lloyd v. Vernieulen, 22 N.J. 200, 206, 125 A.2d 393 (1956). As observed by Judge Learned Hand, "There is no surer way to misread any document than to read it literally." Guiseppi v. Walling, 144 F.2d 608, 624 (2d Cir.) aff'd sub nom Gemsco v. Walling, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945)). It is clear that the meaning of a statute should not be ruled by the strict letter, but rather by the sense and meaning fairly deducible from the context allowing the reason of the provision to prevail over the literal sense of the words. In re Roche, 16 N.J. 579, 587, 109 A.2d 655 (1954). The Legislature's intent emerges from the spirit and policy of the statute rather than the literal sense of particular terms. Caputo v. Best Foods, 17 N.J. 259, 264, 111 A.2d 261 (1955).
The court must read statutes as a whole and give consideration to all related sections. Aragon v. Estate of Snyder, 314 N.J.Super. 635, 640, 715 A.2d 1045 (Ch. Div.1998). Courts should consider not *574 only the particular statute in question, but also the entire legislative scheme of which it is a part. Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 234, 708 A.2d 401 (1998). Where uncertainty arises, the words should be read in context with the entire act and a meaning should be ascribed which avoids a strained or unreasonable construction. Aragon v. Estate of Snyder, supra, at 641, 715 A.2d 1045. The language of a statute, the policy behind a statute, concepts of reasonableness, and legislative history are all appropriate sources for discerning legislative intent. Toll Bros. v. West Windsor Tp., 312 N.J.Super. 540, 547, 712 A.2d 266 (1998). While any history which may be of aid may be consulted, special committees or commissions appointed to study and suggest legislation are considered particularly valuable aids. Shapiro v. Essex Cty. Freeholders Bd., supra, 93; American Fed'n. of State, Cty. and Mun. Emps. v. Hudson Cty. Welfare Bd., 141 N.J.Super. 25, 31-32, 357 A.2d 67 (Ch.Div.1976).
To discern the Legislature's intent, it is necessary to begin with the recognition that the provisions for mayoral selection for the Council-Manager plans were explicitly set forth in full only in Article 9, Section 9-6, dealing with Council-Manager Plan A. Because Plan A called for concurrent terms, the words "members elect" and "members" obviously included the same persons and all parts of that section were internally consistent. Defendant acknowledges that Section 9-6, as it applies to Plan A and Plan C municipalities is applicable to all elections of the mayor and is not limited to mayoral selection at the initial organizational meeting of Council following the adoption of a new charter. However, it nevertheless asserts that the Legislature intended a different result with respect to Plans B, D, E and F. With respect to these plans it asserts that Section 9-6 applies solely to the initial organizational meeting of a council in a municipality which has adopted one of those plans.
The difficulty with this position is that there is absolutely nothing in the legislative history to suggest that the Legislature intended such a distinction. The Second Report of the New Jersey Commission on Municipal Government contained a proposed draft of the Optional Municipal Charter Law which was subsequently adopted by the Legislature. It included Section 9-6 as part of a proposed Article 9 (Plan A) and incorporated that section by reference in Articles 10, 11, and 12 (Plans B, C and D). Section 9-6, as proposed and later adopted, contained the reference to both "members" and "members elect." However, in the summary of its recommendations, the Commission made no distinction between the two. In describing the process of mayoral selection and the mayor's powers, the report stated: "Council shall select one of its members as mayor. He shall have a voice and vote in the proceedings of council, but shall have no veto." Second Report of the Comm. on Municipal Gov't., at 8, (1950). (emphasis added)
It appears that the imprecise usage of the terms "members" and "members elect" with respect to Council-Manager plans is the product of legislative drafting expediency. Rather than setting out at length, in each article, the separate provisions for mayoral selection, the Commission simply incorporated the provisions of Section 9-6 (Plan A) into the other articles by reference. The Legislature, thereafter, adopted the Commission's proposed draft. There is no indication in the legislative history that the statutory language adopted by reference in Articles 10, 11 and 12 was intended by the Legislature to create a substantially different result from use of that language in Article 9.
The fact that the Legislature intended no distinction in the use of the words "members" and "members elect" is further supported by the 1981 amendments to the Faulkner Act. Among other things, the amendments eliminated the alphabetical designations for the different CouncilManager *575 plans and allowed municipalities to adopt any combinations previously defined by those designations. Election of the mayor by council was preserved in Section 9-6 and a new option was created providing for mayoral election directly by the voters for a term of four years. In preserving the option of mayoral election by council, N.J.S.A. 40:69A-86 was recast into its present form which provides:
Any municipality adopting a council-manager plan of government shall provide in its charter ...:
a. That the mayor shall be elected by the members of the council; in which case on the first day of July or January, as appropriate, following their election, the members-elect of the municipal council shall assemble at the usual place of meeting of the governing body of the municipality and organize and elect one of their number as mayor. The mayor shall be chosen by ballot by majority vote of all members of the municipal council. (emphasis added)
The recasting of N.J.S.A. 40:69A-86 retained the language of the original Section 9-6 referring to "members elect" but added the initial phrase "[T]he mayor shall be elected by the members of the council...." (emphasis added) Since the amending legislation allowed municipalities to opt for either concurrent or staggered elections under one broad Council-Manager umbrella, the addition of the new introductory phrase only makes sense if the Legislature intended no distinction between the words "members" and "members elect."
The State of New Jersey County and Municipal Government Study Commission is a legislative agency which has studied and reported recommendations on a variety of subjects to the Governor and Legislature. In 1979, the Commission issued a report on the forms of municipal government in New Jersey. It noted that in practice the then-existing Council-Manager municipalities were using one-, two-, and four-year terms for the mayor. As evidenced by exhibits introduced in this case by defendant, that disparity apparently continues to this day. The Commission concluded that the law was not clear but also observed:
In Council-Manager Plans B, D, E and F of the OMCL, the combination of four-year staggered terms for the council members results in a two-year election cycle, and would seem to lead toward the selection of a mayor by and from that body for a two-year term.
[Forms of Municipal Government in New Jersey, County & Municipal Government Study Commission, at 72 (Seventeenth Report 1979).]
In 1985, the Commission issued a subsequent publication in which it reaffirmed its prior understanding of what the Legislature intended. It stated:
The mayor may be selected by the council from among its own members, in which case he or she will serve for a two- or four-year term until the organization meeting following the next council election.
[The Changing Structure of New Jersey Municipal Government, County and Municipal Study Commission, at 29 (1985).]
As previously noted, the comments of special committees or commissions appointed to study and suggest legislation are particularly useful in seeking to understand legislative intent.
To accept defendant's construction of the statute would mean that the Legislature established a defined term of office for the mayor in Plan A and Plan C municipalities but left the term of office under the other plans completely to the discretion of the municipalities. Thus, the term of office for the mayor could differ among municipalities which had adopted the same plan. Under such a construction, the mayor's term could theoretically range from one day to two years depending upon the municipality. Such a result is inconsistent with the basic purposes underlying the Faulkner Act. While the Act intended to *576 confer the greatest possible power of local self-government, it did so by providing a flexible general pattern from which municipalities could make choices suited to their needs. The Act intended to deal with the problem of the vast number and types of local government then existing by allowing flexibility within a prescribed range of choices. Newark v. Dept. of Civil Service, 68 N.J.Super. 416, 425, 172 A.2d 681 (App. Div.1961); Mentus v. Irvington, 79 N.J.Super. 465, 470, 191 A.2d 806 (Law Div.1963). It is not likely that the Legislature would have dealt with an issue so fundamental as the term of office of a mayor by establishing the term for some Council-Manager plans and remaining silent as to others. In this regard, it is significant to note that the Faulkner Act deals with the term of office for all other legislatively created positions in the Council-Manager form of government. The term of office for councilpersons is four years. N.J.S.A. 40:69A-83.3. The term of office for a popularly-elected mayor is four years. N.J.S.A. 40:69A-86b. The term of office for a mayor selected by council in a Plan A or C form is four years. N.J.S.A. 40:69A-86a. The term of office for the municipal manager is indefinite, subject to removal by a majority vote of council after notice and a hearing. N.J.S.A. 40:69A-93. Defendant's assertion that the Legislature intentionally left the term of the mayor in Plans B, D, E and F to local discretion is simply not persuasive.
Finally, defendant relies upon N.J.S.A. 40:69A-29 and 30 as evidence of a legislative intent to allow municipalities flexibility in fixing the term of office for the mayor. N.J.S.A. 40:69A-29(a) provides:
Each municipality governed by an optional form of government pursuant to this act shall, subject to the provisions of this act or other general laws, have full power to:
(a) Organize and regulate its internal affairs, and to establish, alter, and abolish offices, positions and employments and to define the functions, powers and duties thereof and fix their terms, tenure and compensation.
N.J.S.A. 40:69A-30 provides that grants of power to municipalities governed by an optional plan under the Act should be liberally construed in favor of the municipality.
Defendant asserts that, when liberally construed, N.J.S.A. 40:69A-29(a) allows it to fix the mayor's term of office. The difficulty with this argument is that even where liberal construction is called for, the court cannot interpret a statute in a manner that would conflict with the expressed will of the Legislature. Although N.J.S.A. 40:69A-29(a) gives a municipality the broad power to organize and regulate its internal affairs, it does not appear that this provision was intended to apply to the statutorily created positions in a Council-Manager form of government. By way of example, the municipality cannot "establish, alter or abolish" the positions of councilperson, mayor, or manager. See N.J.S.A. 40:69A-83, N.J.S.A. 40:69A-86, and N.J.S.A. 40:69A-89. Neither does the municipality "define the functions, powers and duties" for those offices. See N.J.S.A. 40:69A-87, N.J.S.A. 40:69A-88, and N.J.S.A. 40:69A-95. Rather, it would appear that N.J.S.A. 40:69A-29(a) was intended to apply to those offices and positions which are clearly within the discretionary power of the municipality to create or abolish.
This conclusion is further supported by the commentary of the Commission on Municipal Government which initially proposed the statutory provision. The proposed Optional Municipal Charter Law would grant broad new powers to municipalities governed by any of its optional forms. However, the extent of the proposed powers was not limitless. The Commission's commentary clearly indicated what was intended by the recommendation. It stated:

*577 Although municipal government still remains subject to the control of the Legislature as required by the new Constitution, legislative control is expressed in a broad and complete authorization which leaves the widest possible discretion with each municipality to determine the organization of its departments, the compensation of its officers and employees, the range and character of its services, subject to the provisions of general law which apply to all municipalities.

[Second Report of the Comm. on Municipal Gov't., supra. 3.]
There is no suggestion that the broad discretion referenced in N.J.S.A. 40:69A-29 was intended to allow municipalities to define the term of office for a statutorily created position.
In the final analysis, the court must choose between two alternatives. One choice gives effect to a logical and consistent legislative approach encompassing all municipalities operating under a Council-Manager form of government. The other alternative, for no apparent reason, deals with a critical local governmental office in a piecemeal and inconsistent fashion.
By resorting to a drafting device of incorporation by reference, the Legislature may have been less than perfectly clear in its drafting of certain provisions of the Faulkner Act. However, its basic intent is clear when those provisions are considered in the context of the entire Faulkner Act, its underlying policy, its history, and relevant historical commentary. The Legislature intended a result that provided for a rational and comprehensive scheme of local government within which municipalities could make reasonable choices to best suit their needs. The Faulkner Act intended to give local governments broad discretion to manage their affairs, but that discretion was to be exercised within the basic patterns established by the Act. It did not give local government a blank check.
In construing Section 9-6 as applied to Galloway Township, the court therefore concludes that the mayor is to be elected by Council on January 1 following each November election at which members of council are regularly elected. The mayor shall serve until January 1 following the next such election which, in effect, is for a term of two years.
Mayor Conover was elected to a two-year term on January 1, 1998. Upon her death, the plaintiff was elected to serve the balance of her unexpired term. Since that term will not expire until January 1, 2000, plaintiff is the duly-elected Mayor of Galloway Township, and is entitled to hold and exercise all of the powers of that office. Accordingly, the court determines that the action of the Galloway Township Council of January 1, 1999, in electing John Kelley as mayor, is null and void. Article 2, Section 5 of the Galloway Township Administrative Code, to the extent same is inconsistent with this opinion, is declared invalid.
Judgment is entered for Plaintiff.