754 A.2d 1237 (2000)
333 N.J. Super. 206
Lorraine FRANEK, as Administrator of the Estate of Millie Della Volpe, Plaintiff-Appellant,
v.
TOMAHAWK LAKE RESORT, Chester J. Wallace, Tomahawk Lake, Inc., and Fun Valley, Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 18, 2000 (by telephone).
Decided July 20, 2000.
*1239 Edward Kopelson, Morristown, for plaintiff-appellant (Kopelson & Westreich, attorneys; Mr. Kopelson and Robert Westreich, on the brief).
Deirdre Rafferty Thompson, for defendants-respondents.
Before Judges STERN, KESTIN and STEINBERG.
*1238 The opinion the court was delivered by KESTIN, J.A.D.
Plaintiff appeals from a Law Division order dismissing the complaint (with jury demand) which, in a single count, alleged unlawful discrimination in violation of the Law Against Discrimination, N.J.S.A. 10:5-1 to -42(LAD). We reverse and remand.
The dismissal eventuated from a grant of defendants' motion for summary judgment. Accordingly, we view the facts in the light most favorable to plaintiff, the respondent on the motion, to determine whether a genuine issue of material fact exists in respect of which plaintiff is entitled to plenary consideration by a finder of fact. See Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995).
On July 10, 1994, Millie Della Volpe, then eighty-three years old and since deceased, visited Tomahawk Lake Resort to participate in a family picnic. The resort, a privately-owned recreational facility available to the public for such activities and subject to the public accommodations provisions of the LAD, is operated by defendant Tomahawk Lake, Inc.
*1240 Both of Della Volpe's legs had been amputated and she was confined to a wheelchair. According to the deposition testimony of plaintiff's witnesses in this matter and in an earlier, related federal court matter, Della Volpe had been driven to the picnic by her daughter, Lorraine Franek. The complaint alleges that another daughter, Delores Otero, had telephoned Tomahawk Lake Resort in advance and had "inquired about wheelchair accessibility for ... Volpe, and was informed that there were facilities for persons with physical disabilities[.]" When Della Volpe and Franek arrived, however, they found that there were no facilities on the premises for the handicapped and no handicapped-parking spaces. Otero, who had been waiting for them, asked a parking attendant if the car might drive beyond the parking field to the entrance to the grounds, or even closer to the picnic area, to allow her mother and the wheelchair to be dropped off.
The parking attendant radioed defendant Chester Wallace for permission. Wallace, who was supervising parking at the time, is the majority shareholder and sole officer of defendant Fun Valley, Inc., which owns the property on which the recreational facility is located. Both the property and the facility are owned and operated as a Wallace family business by corporate entities belonging to Chester Wallace, his wife and his son.
Wallace denied the radioed request. Otero testified that she then walked down the hill to speak with him directly concerning her mother's disability and the need for special consideration. She alleged that Wallace responded: "I don't want those kind of people here." [*] Otero testified further that "they let my mother off [some distance away], my brother-in-law took out the chair, put her in the chair and we went down, we walked it there, and then we proceeded to walk up the hill to where the tables were."
Millie Della Volpe also testified in depositions on January 31, 1996, when she was eighty-six years old. She said that she had witnessed an argument but, because she was seated in the vehicle, she could not hear what was being said. About a halfhour later, she learned of the details and was "very hurt when I heard about the argument was on account of me, and I said, see, I shouldn't have come. Had I not been here, this argument wouldn't have started." She also testified that after learning the details, she was unhappy to be at the facility and wished to leave early. "[Y]ou go to a place to have a good time and it starts out with an argument for no good reason at all." She concluded her testimony by noting that she hadn't been back to Tomahawk Lake since.
Franek testified that although her mother could not hear the conversation between Otero and Wallace, she knew what it was about, and indicated, while still in the car, that she was upset with the difficulty engendered by her physical limitations.
The complaint also alleges that during the course of her stay at the picnic, Della Volpe attempted to use the bathroom facilities, but they "were not accessible by wheelchair users ... and she had to be carried into the bathroom." The complaint goes on to characterize the facility as not amenable to use by "mobility-impaired persons", and to allege that defendants acted in disregard of Della Volpe's rights and caused her mental anguish and humiliation.
The trial court's reasons for granting defendant's motion for summary judgment and dismissing the complaint were expressed in a written opinion. The conclusion was stated at the outset: "[T]he court is not satisfied that the defendant's conduct, when viewed in the light most favorable to the plaintiff, would permit a rational factfinder to resolve this matter in favor of plaintiff." (Citing Brill, supra, 142 N.J. at 540, 666 A.2d 146.) After stating the *1241 facts, the motion judge described the positions of the parties as follows:
[P]laintiff argues that "There is no doubt that saying to a disabled person (or a racial or religious minority) `we don't want your kind here' constitutes an act of discrimination." The defendants argue that Millie Della Volpe had full and equal access to the Tomahawk Lake facilities and that there was no violation of the LAD.
The opinion went on to note that an earlier claim under § 12181 of the Americans with Disabilities Act, 42 U.S.C.A. §§ 12101 to 12213, had been dismissed by the United States District Court for the District of New Jersey. With that dismissal, the federal court had declined to exercise jurisdiction over claims based on state law, i.e., the LAD and the Handicapped Access Law, N.J.S.A. 52:32-4 to -16(HAL), originally asserted by way of pendent (supplemental) jurisdiction. See 28 U.S.C.A. § 1367. That dismissal led to the filing of the instant complaint shortly thereafter, on August 25,1997.
The Law Division judge observed that this complaint "does not seek any specific equitable relief and it does not seek to compel the defendants to comply with the HAL" nor, according to the judge, could it. The opinion noted:
Even though the plaintiff cannot seek redress for HAL violations in the Superior Court, the plaintiff apparently seeks to utilize the alleged HAL violations in support of her LAD claim. The plaintiff alleges that the defendant's failure to provide handicapped designated parking spaces and bathroom facilities accessible to wheelchair users are part and parcel of a pattern of discriminatory conduct directed at handicapped individuals. Thus, ... a contributing factor to an abusive, hostile and discriminatory environment that confronted Millie Della Volpe....
The judge went on to hold that "it would be inappropriate for a judge or jury [in a civil action] to decide if there were HAL violations" because that role was reserved to an administrative agency. (Citing D.I.A.L., Inc. v. Department of Community Affairs, 254 N.J.Super. 426, 439, 603 A.2d 967 (App.Div.1992)). On that basis the judge concluded that plaintiff could not, in this case, "clearly establish[ ]" HAL violations, and determined that "plaintiff is barred from asserting HAL violations as evidence of a LAD claim."
Turning to the LAD, the motion judge correctly identified N.J.S.A. 10:5-12 as the statutory source of plaintiff's claim of unlawful discrimination in a place of public accommodation:
It shall be unlawful employment practice, or, as the case may be, an unlawful discrimination:
* * *
f. (1) For any owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof or to discriminate against any person in the furnishing thereof ....
and N.J.S.A. 10:5-4.1 as the basis for a claim of discrimination against the handicapped:
All of the provisions of the act to which this act is a supplement shall be construed to prohibit any unlawful discrimination against any person because such person is or has been at any time handicapped....
The court also quite appropriately recited from a statement of public policy enacted as part of the LAD. That statement, in pertinent portion, provides:
[S]uch discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundations of a free democratic State....
* * *
The Legislature further finds that because of discrimination, people suffer *1242 personal hardships, and the State suffers a grievous harm. The personal hardships ... particularly impact on those protected by this act.

[N.J.S.A. 10:5-3.]
The motion judge then went on to appraise the conduct at issue by the standards of some leading handicap-discrimination-in-employment cases such as Andersen v. Exxon Co., 89 N.J. 483, 446 A.2d 486 (1982), and Seiden v. Marina Assoc., 315 N.J.Super. 451, 718 A.2d 1230 (Law Div.1998); and, more generally, by the decisional rationales of various types of hostile work environment cases such as Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685 (1998); Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993); and Leonard v. Metropolitan Life Ins. Co., 318 N.J.Super. 337, 723 A.2d 1007 (App. Div.1999). The judge concluded that the standards articulated by these cases for establishing unlawful discrimination had not been met.
Finally, with respect to "plaintiff's affirmative accommodation claim," the motion judge held that an owner or operator of a public facility has no affirmative duty in respect of patrons which is parallel to an employer's duty to make reasonable accommodations for a handicapped employee. Once again drawing on statutory and regulatory provisions relating to the employment relationship, and rejecting two out-of-state cases that established an affirmative duty to take reasonable steps to provide access to public accommodations, Hankins v. El Torito Restaurants, Inc., 63 Cal.App.4th 510, 74 Cal.Rptr.2d 684 (Ct. App.1998); Spagnuolo v. Rudds # 2, Inc., 221 Mich.App. 358, 561 N.W.2d 500 (1997), the motion judge held that while plaintiff's special need was not affirmatively accommodated by the defendant... this refusal ... did not interfere with, hinder, or prevent the plaintiff from accessing the public facilities at Tomahawk Lake. Accordingly, the plaintiff was not denied access to public facilities and there was no unlawful discrimination.
We regard it to have been error for the trial court, in a public accommodations case, to make overgeneralized use of specific principles and approaches developed to determine liability in employment discrimination cases. Public accommodations cases do not involve ongoing organizational connections or the need to make allowances for other special features of the employer-employee relationship, such as its hierarchical qualities. By the very nature of the day-to-day personal involvements which characterize the employment situation, a hostile working environment is a very special problem; it has less in common than the terms seem to convey with insulting or humiliating words or conduct designed to discourage a potential patron's use of a public accommodation.
Moreover, the treatment of plaintiff's "affirmative accommodation claim," as it was denominated by the trial court, also evinces an erroneous understanding of the policies underlying the provisions of the LAD and a mistaken application of the statutory standards.
This case is far simpler than depicted by the parties or treated by the trial court. As the second Justice Harlan once pointed out, "[i]n order to lay hands on the precise issue which [a] case involves, it is [sometimes] useful first to canvass various matters which [the] record does not present." Cohen v. California, 403 U.S. 15, 18, 91 S.Ct. 1780, 1784, 29 L.Ed.2d 284, 289, reh'g denied, 404 U.S. 876, 92 S.Ct. 26, 30 L.Ed.2d 124 (1971).
There is no claim for relief under HAL and no need to establish a violation of that act. Plaintiff is nevertheless not precluded from showing, by way of support for her argument of unlawful discrimination, the extent to which defendants did or did not comply with HAL requirements. Such a showing would go to the focal issue in the case, whether defendants *1243 acted with an actual or apparent design to discourage present or future use of their public accommodation by handicapped persons. A plaintiff in a civil action is not precluded from relevantly showing a violation of statute or administrative regulation as an element of proof. See, e.g., Alloway v. Bradlees, 157 N.J. 221, 236, 723 A. 2d 960 (1999) (approving the "well-established principle that the violation of a legislated standard of conduct may be regarded as evidence of negligence if the plaintiff was a member of the class for whose benefit the standard was established").
Plaintiff does not claim that Della Volpe was denied the use of defendant's public accommodation on the day in question; rather, plaintiff contends that Della Volpe and others acting on her behalf were embarrassed and humiliated in their effort to do so and were discouraged from using the facility on that day and in the future. The fact that plaintiff's decedent was not denied the use of the public accommodation on the one occasion does not diminish the viability of her LAD-based claim for defendant's conduct in attempting to discourage, because of decedent's handicap, her use of it on that day and on future occasions. It is unquestionably a violation of the LAD for the owner or operator of a public accommodation to tell a person, either directly or indirectly, that his or her patronage is not welcome because of a trait or condition which the LAD protects from discriminatory action, even though use of the facility on the particular occasion is not denied. Evans v. Ross, 57 N.J.Super. 223, 231, 154 A.2d 441 (App. Div.) (noting that once "a proprietor extends his invitation to the public he must treat all members of the public alike"), certif. denied, 31 N.J. 292, 157 A.2d 362 (1959). See generally Uston v. Resorts Int'l Hotel, Inc., 89 N.J. 163, 173, 445 A. 2d 370 (1982) (stating that "when property owners open their premises to the general public in the pursuit of their own property interests, ... they have a duty not to act in an arbitrary or discriminatory manner towards persons who come on their premises").
Such a rule does not stretch the plain meaning of the public accommodations provisions of the LAD, rather it vindicates the terms of the legislation and its underlying policies. It is well-established that the LAD is intended to be New Jersey's remedy for unacceptable discrimination and is to be construed liberally. Cedeno v. Montclair State Univ., 163 N.J. 473, 478, 750 A.2d 73 (2000) (recognizing "the important public policies of the LAD... and the need to construe [it] liberally to achieve those policies"); Andersen v. Exxon Co., 89 N.J. 483, 495, 446 A.2d 486 (1982) (same); Fraser v. Robin Dee Day Camp, 44 N.J. 480, 486, 210 A.2d 208 (1965) (same). In construing the LAD, courts must give prime consideration to the object of the legislation and the evils it is designed to remedy. Evans v. Ross, supra, 57 N.J.Super. at 230, 154 A.2d 441; see also Hernandez v. Region Nine Hous. Corp., 146 N.J. 645, 651-52, 684 A.2d 1385 (1996) (recognizing the strong public policy underlying the LAD, and the importance of using the act to further these policies); National Org. for Women v. Little League Baseball, Inc., 127 N.J.Super. 522, 533, 318 A.2d 33 (App.Div.), aff'd, 67 N.J. 320, 338 A.2d 198 (1974). Among its other objectives, the LAD is intended to insure that handicapped persons will have "full and equal access to society, limited only by physical limitations they cannot overcome." D.I.A.L., Inc. v. New Jersey Dept. of Community Affairs, supra, 254 N.J.Super. at 439, 603 A.2d 967.
The remark by the owner or operator of a public accommodation "I don't want those kind of people here" is a prima facie basis for a claim of unlawful discrimination in an LAD-based action by a handicapped person. Especially when accompanied by some other proffers tending to show a design to discriminate on forbidden grounds, it provides a sufficient reason for denying the defendants' motion for summary judgment. N.J.S.A. 10:5-12 not only prohibits the owner or operator of a public accommodation from denying the use of a facility on forbidden grounds, but *1244 it also renders unlawful any acts "discriminat[ing] against any person in the furnishing thereof[.]" N.J.S.A. 10:5-12f(1). Although the statute isolates for special treatment written communications of any kind that announce the unavailability of the facility on prohibited grounds, oral communications to the same effect are in no way immune as causes for relief, as defendants contend.
In resolving any question of statutory construction, "our task is to effectuate the legislative intent in light of the language used and the objects sought to be achieved." State v. Maguire, 84 N.J. 508, 514, 423 A.2d 294 (1980).
[L]egislative intent may be implied from the language of a statute or inferred on grounds of policy or reasonableness.... [S]tatutes are to be read sensibly rather than literally, and the controlling legislative intent is to be presumed as consonant to reason and good discretion. Courts should avoid interpreting a statute in a manner that leads to an absurd, anomalous, or unreasonable result. Rather, statutory interpretations should turn on the breadth of the legislative objectives and the common sense of the situation.
* * *
The court must read statutes as a whole and give consideration to all related sections. Courts should consider not only the particular statute in question, but also the entire legislative scheme of which it is a part.
[Styles v. Township of Galloway, 323 N.J.Super. 191, 199-200, 732 A.2d 569 (Law Div.1999) (citations omitted).]
Considering the stated intendment of the Legislature in enacting the LAD, and mindful of the policies it chose to promote, there can be no question that a statement such as defendant Wallace is alleged to have made, "I don't want those kind of people here," or "You shouldn't bring these kind of people here," connotes a violation of the public accommodations provisions of the LAD. It may well be, as defendant argues, that such a statement does not constitute a per se violation of the LAD but, because we must for summary judgment purposes accept that it was said, plaintiff's claim is insulated from dismissal at this stage. At minimum, plaintiff is entitled to a plenary proof opportunity to satisfy her burden of establishing through all the attendant facts and circumstances that defendants treated her, as a handicapped person, in an unlawfully discriminatory manner or intended to discourage her, because of her handicap, from using the facility on the day in question or thereafter.
It is a considerable understatement to classify the statement made, as the trial judge did, as "a mere offensive utterance." Furthermore, this evaluation, even when viewed in the most indulgent light, usurped the jury's function. See Brill, supra, 142 N.J. at 540, 666 A.2d 146; cf. Gilhooley v. County of Union, 164 N.J. 533, 544-46, 753 A.2d 1137 (2000).
For these reasons, we reverse the trial court's grant of defendants' motion for summary judgment and its dismissal of the complaint. We remand for further proceedings consistent with this opinion.
NOTES
[*] The motion judge's opinion recounts this remark as: "You shouldn't bring these kind of people here." The difference is immaterial for our present purposes.