832 A.2d 340 (2003)
363 N.J. Super. 186
Delois TURNER, Plaintiff-Appellant,
v.
Nancy WONG, Individually and trading as Donut Connection, The Donut Connection Cooperative Corporation, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted September 8, 2003.
Decided October 2, 2003.
*345 Rossi, Barry, Corrado & Grassi, attorneys for appellant (Frank L. Corrado, Wildwood, on the brief).
Cahill, Wilinski & Rhodes, attorneys for respondents (Vincent T. Cieslik, on the brief).
Before Judges HAVEY, PARRILLO and HOENS. *341 *342 *343
*344 The opinion of the court was delivered by PARRILLO, J.A.D.
Plaintiff Delois Turner appeals from the Law Division's summary judgment dismissal of her complaint against defendants Nancy Wong and The Donut Connection Cooperative Corporation for malicious prosecution, intentional infliction of emotional distress, and denial of the benefits of a public accommodation based on race in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, and 42 U.S.C.A. § 1981.
On review of this summary judgment determination, we view the facts in a light most favorable to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). They may be briefly stated. On March 4, 2000, plaintiff, a fifty-seven-year old African-American who resides in New York State, entered defendant's store in Cape May Court House, New Jersey, to buy a cup of coffee and a donut. She was waited on by defendant Wong (defendant), the owner and operator of the store, who served plaintiff the donut first. While defendant turned to get *346 the cup of coffee, plaintiff tasted the donut and complained that it was stale. Defendant replied that her donuts were baked fresh daily. Plaintiff responded that, while she did not doubt this, her donut was nevertheless stale. She requested a new one.
Defendant refused, insisting that plaintiff had to pay first. Plaintiff, having no intention of paying for the stale donut, instead demanded that she be given a new donut first. Defendant then called plaintiff a "black nigger from Philadelphia," repeating that phrase three or four times in front of other customers in the shop, who were all white. According to plaintiff, defendant railed, "you black niggers come in here, give me a hard time. White people don't give me a hard time. White people nice people." Although she threatened to call the police, defendant never did. Instead her son Kevin intervened, voided the charge for the donut from the cash register, and told plaintiff to pay for just the coffee, which she did.
When plaintiff asked defendant where there was a phone, defendant pointed to the door and told plaintiff to "get out of my store." Unable to obtain another donut and having been subjected to these racial insults, plaintiff left the store and filed a complaint with the Middle Township police who charged defendant with an indictable bias crime, N.J.S.A. 2C:33-4(d).[1] On the same day, while at the police station being processed, defendant filed a complaint against plaintiff who, as a result, was charged with theft of a donut in violation of N.J.S.A. 2C:20-3(a). That charge was administratively dismissed by the Cape May County Prosecutor's Office on May 17, 2000, pursuant to R. 3:25-1. On the same date, the prosecutor downgraded the bias charge against defendant to the petty disorderly persons offense of harassment, N.J.S.A. 2C:33-4(a), for which she was tried in municipal court, convicted, and fined $250. The municipal judge found that defendant had used the word "nigger" several times in a loud voice and had accused black people of giving her a hard time, that defendant's son even tried to quiet her down, and that the words were uttered intentionally to cause plaintiff alarm.
As a result of the March 4, 2000 incident, plaintiff was embarrassed, shocked, mortified, hurt, angry and humiliated, although she never sought medical, therapeutic or psychiatric treatment. She claimed that since the incident, her self-esteem had deteriorated and that she viewed herself differently. Consequently, she filed this lawsuit against defendants, alleging malicious prosecution based on the theft charge, intentional and negligent infliction of emotional distress, and racial discrimination in violation of both N.J.S.A. 10:5-4 and 42 U.S.C.A. § 1981. Without moving to amend her complaint, plaintiff also belatedly asserted a civil bias claim under N.J.S.A. 2A:53A-21.
After completion of discovery, defendants moved for summary judgment. The trial court granted the motion, dismissing all of plaintiff's claims. Specifically, the court found that plaintiff failed to demonstrate either a "special grievance" to support her malicious prosecution claim, "severe" emotional distress to sustain the intentional tort alleged, or denial of a "benefit of public accommodation" for purposes of 42 U.S.C.A. § 1981 and N.J.S.A. 10:5-4. During oral argument on the summary judgment motion, plaintiff conceded she had no cause of action *347 for negligent infliction of emotional distress. There was no disposition of plaintiff's last-minute civil bias claim because it was not asserted before the trial court's summary judgment determination, and plaintiff never moved for reconsideration or to amend her complaint.
Plaintiff appeals from the summary judgment dismissal of her complaint. For reasons that follow, we affirm the dismissal of the claim of intentional infliction of emotional distress, finding no proof that plaintiff suffered severe emotional distress, and the malicious prosecution claim, finding no evidence of a "special grievance." However, we reverse the dismissal of the discrimination counts, finding genuine issues of material fact exist with respect to each that would support the respective causes of action.
We review the trial court's grant of defendant's motion for summary judgment de novo, applying the same legal standard as the trial court under Rule 4:46-2(c). Antheunisse v. Tiffany, 229 N.J.Super. 399, 402, 551 A.2d 1006 (App. Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989). A motion for summary judgment should be granted only when the moving party establishes the absence of any genuine issue as to a material fact. Brill v. Guardian Life Ins. Co. of Am., supra, 142 N.J. at 539-40, 666 A.2d 146. On this appeal, we accept plaintiff's version of defendant's conduct as true and give plaintiff the benefit of all reasonable inferences from the facts. Baliko v. Stecker, 275 N.J.Super. 182, 186, 645 A.2d 1218 (App.Div.1994). If there is no genuine issue of material fact, we decide whether the trial court's ruling on the law was correct. Prudential Prop. Ins. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App. Div.1998). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty L.P. v. Township of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).

I
Plaintiff claims that proof of humiliation, embarrassment and disbelief, caused by racial slurs, was sufficient to establish a prima facie case of intentional infliction of emotional distress. We disagree.
To establish a claim for intentional infliction of emotional distress, a plaintiff must show that: the defendant acted intentionally or recklessly, both in doing the act and producing emotional distress; the conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency; the defendant's actions were the proximate cause of the emotional distress; and the distress suffered was so severe that no reasonable person could be expected to endure it. Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988). Here, the court dismissed plaintiff's claim solely on the ground that she did not prove this last element of severe emotional distress.[2]
*348 Severe emotional distress is a severe and disabling emotional or mental condition which may be generally recognized and diagnosed by trained professionals. Taylor v. Metzger, 152 N.J. 490, 515, 706 A.2d 685 (1998). The emotional distress must be sufficiently substantial to result in either physical illness or serious psychological sequelae. Aly v. Garcia, 333 N.J.Super. 195, 204, 754 A.2d 1232 (App. Div.2000), certif. denied, 167 N.J. 87, 769 A.2d 1050 (2001). The standard is an objective one. The defendant's conduct must be "sufficiently severe to `cause genuine and substantial emotional distress or mental harm to average persons.'" Taylor, supra, 152 N.J. at 516, 706 A.2d 685 (quoting Decker v. Princeton Packet, Inc., 116 N.J. 418, 430, 561 A.2d 1122 (1989)). The average person, of course, must be one similarly situated to the plaintiff. Ibid. "Whenever an intentional infliction of emotional distress claim arises out of conduct that also constitutes invidious discrimination on the basis of `race' ..., the average person standard must be adapted to reflect those characteristics of the plaintiff that are the focus of the alleged discrimination." Id. at 516-17, 706 A.2d 685.
Mere allegations of "aggravation, embarrassment, an unspecified number of headaches, and loss of sleep," are insufficient as a matter of law to support a finding of severe mental distress that no reasonable person could be expected to endure. Buckley, supra, 111 N.J. at 368, 544 A.2d 857. In Aly, supra, 333 N.J.Super. at 204-05, 754 A.2d 1232, we held that it is not enough for the plaintiff to allege that he or she was "acutely upset" by the incident in question, especially where no medical assistance or counseling is sought. And in Griffin v. Tops Appliance City, Inc., 337 N.J.Super. 15, 26, 766 A.2d 292 (App.Div.2001), we found no cause of action where the plaintiff claimed merely that he felt terrible, that he was devastated, and that his whole personality changed as a result of the incident in question. He did not suffer from any headaches, he had no difficulty sleeping, he was not unable to perform his daily routine, and he did not seek medical assistance or present an expert medical opinion. Ibid.
Similarly, in Lascurain v. City of Newark, 349 N.J.Super. 251, 280, 793 A.2d 731 (App.Div.2002), the plaintiff did not establish severe emotional distress where she claimed that she became nauseous and upset, was depressed, had nightmares, and no longer enjoyed her daily activities. The court found that, although the plaintiff's personal physician corroborated her depression, there had been no dramatic impact on her everyday activities or her ability to function and she had not sought regular psychiatric counseling. Ibid.; see Harris v. Middlesex Cty. College, 353 N.J.Super. 31, 47, 801 A.2d 397 (App.Div. 2002) (no evidence of severe emotional distress where no allegation of interference with daily activities, no expert to support claims of emotional devastation or loss of self-esteem, and no evidence of counseling or treatment).
To be sure, the invocation of racial slurs may conceivably be sufficient to cause severe emotional distress to the average African-American. Taylor, supra, 152 N.J. at 518, 706 A.2d 685. In Taylor, the plaintiff demonstrated that she had regularly undergone psychotherapy, resorted to wearing a bullet-proof vest because of fear, had been treated for anxiety, had suffered mood changes, insomnia, nightmares, and flashbacks, and had been diagnosed as suffering from post-traumatic stress disorder. Id. at 514, 706 A.2d 685. The Court determined, based on these injuries, that a rational factfinder may find that the defendant's conduct would have *349 caused severe emotional distress in the average African-American. Id. at 518, 706 A.2d 685.
Of course, the inquiry here is not whether racial insults could inflict severe emotional distress, but rather whether the racial epithets uttered in this case actually did cause plaintiff severe emotional distress. In marked contrast to Taylor, plaintiff here never sought medical, psychological or other professional treatment as a result of the March 4, 2000 incident. Nor did she offer any medical or expert proof to corroborate her feelings of lost self-esteem or anger. Moreover, plaintiff's claimed distress never manifested itself physically or objectively by way of headaches, loss of sleep, inability to perform her daily functions, or any condition that was professionally diagnosed. Instead, plaintiff merely claimed that she felt humiliated and mortified because of the racial insults. Yet we cannot infer severe emotional distress simply from proof of racial slurs alone without further evidence of resultant physical illness or serious psychological sequella, see Taylor, supra, 152 N.J. at 515, 706 A.2d 685, none of which has been proffered by plaintiff.
Nothing in our recent decision in Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 360 N.J.Super. 265, 822 A.2d 647 (App.Div.2003), is to the contrary. In holding that a plaintiff alleging discrimination in a workplace environment does not have to meet the severe and substantial standard in order to create a jury question, Tarr, supra, 360 N.J.Super. at 271, 822 A.2d 647, we expressly distinguished that claim from those, as alleged here, based on the intentional tort of outrage. Emotional distress suffered by reason of proscribed discrimination is a "category distinct and separate from claims of negligent or intentional infliction of emotional distress in other contexts." Ibid. As to the latter, the injury is compensable "only if it is severe and substantial, ... not merely transitory but rather has a discernible effect on the plaintiff's ability to function normally, either physically or psychologically, on a daily basis." Id. at 271, 822 A.2d 647 (citing Buckley, supra, 111 N.J. at 369, 544 A.2d 857; Lascurain, supra, 349 N.J.Super. at 280-82, 793 A.2d 731.)
While plaintiff's proofs of humiliation and indignity may very well be sufficient to withstand a motion to dismiss her LAD claim (see infra), they fall far short of sustaining a cause of action for the intentional tort. Without corroborating medical proof or evidence of physical or psychological symptoms, there exists no genuine issue of material fact as to the severity or substantiality of plaintiff's emotional distress. Accordingly, we conclude that the trial court properly dismissed this cause of action.

II
The trial court dismissed plaintiff's malicious prosecution claim based on her failure to prove that she suffered a "special grievance" as a result of the disorderly persons theft charge filed against her by defendant Wong. We agree. Whatever constraints or adverse consequences on the exercise of plaintiff's civil rights may have been intended by the filing of the disorderly persons' offense charge, none was achieved. Therefore, no interference with plaintiff's liberty or impairment of the common weal has been demonstrated to satisfy the "special grievance" element of this cause of action.
A claim for malicious prosecution arising out of a criminal proceeding requires proof that: the criminal action was instituted by the defendant against the plaintiff; it was actuated by malice; there was the absence of probable cause for the proceeding; and it was terminated *350 favorably to the plaintiff. Lind v. Schmid, 67 N.J. 255, 262, 337 A.2d 365 (1975); Geyer v. Faiella, 279 N.J.Super. 386, 394, 652 A.2d 1245 (App.Div.), certif. denied, 141 N.J. 95, 660 A.2d 1194 (1995); Vickey v. Nessler, 230 N.J.Super. 141, 146, 553 A.2d 34 (App.Div.), certif. denied, 117 N.J. 74, 563 A.2d 836 (1989). However, when the underlying proceeding is civil rather than criminal, or based on traffic, disorderly persons, or petty disorderly persons charges-involving none of the physical constraints ordinarily attendant to the criminal processthe cause of action is known as malicious use of process and requires proof of a deprivation of liberty or "other special grievance." Vickey, supra, 230 N.J.Super. at 146, 553 A.2d 34. See also Campione v. Adamar of N.J., Inc., 155 N.J. 245, 268, 714 A.2d 299 (1998); Baglini v. Lauletta, 338 N.J.Super. 282, 299, 768 A.2d 825 (App.Div.2001); LoBiondo v. Schwartz, 323 N.J.Super. 391, 423, 733 A.2d 516 (App.Div.), certif. denied, 162 N.J. 488, 744 A.2d 1211 (1999); Klesh v. Coddington, 295 N.J.Super. 1, 3, 684 A.2d 504 (App.Div.1996), certif. denied, 147 N.J. 580, 688 A.2d 1055 (1997). The tort of malicious use of process is disfavored out of fear that its use could chill free access to the courts, Tedards v. Auty, 232 N.J.Super. 541, 549, 557 A.2d 1030 (App. Div.1989), and consequently, it is not much resorted to. LoBiondo, supra, 323 N.J.Super. at 422, 733 A.2d 516.
Here, plaintiff does not really dispute that she must prove a "special grievance", but argues that the potential deprivation of her constitutional rights satisfies that requirement. We disagree.
At the outset, we are satisfied that the proofs could be found by a reasonable trier of fact to belie probable cause for the bringing of the theft charge against plaintiff by defendant. We are also satisfied that the element of malice may be met by a showing that the purpose of filing the complaint for theft was to retaliate against plaintiff for filing bias crime charges against defendants and for attempting thereby to vindicate her civil rights, an inference reasonably drawn from the facts indulgently viewed in plaintiff's favor. That is to say, we regard the filing of a complaint for theft for the purpose of suppressing the exercise of one's right to enforce her civil rights as per se malicious in this context. Cf. LoBiondo, supra, 323 N.J.Super. at 423, 733 A.2d 516. As to the element of favorable termination, the theft charge was administratively dismissed by the Cape May County Prosecutor's Office.
That leaves the final element of the cause of action, special grievance, which is "somewhat problematical." LoBiondo, supra, 323 N.J.Super. at 423, 733 A.2d 516. "Special grievance is an elusive concept." Ibid. It has been defined as consisting of "interference with one's liberty or property." Penwag Prop. Co., Inc. v. Landau, 76 N.J. 595, 598, 388 A.2d 1265 (1978). It is injury different from, and in addition to, the ordinary expense of a defense. Ibid. Thus, while counsel fees and costs may be an element of damages in a successful malicious prosecution action, they do not by themselves constitute the special grievance necessary to make out the cause of action. Ibid. Similarly, mental anguish, emotional distress, or loss of reputation from the filing of a complaint are not the special injuries required to sustain a malicious prosecution action. Brien v. Lomazow, 227 N.J.Super. 288, 304, 547 A.2d 318 (App.Div.1988). On the other hand, the loss of one's ability to practice his or her profession, with a resultant loss of income, does constitute a special grievance. Giri v. Rutgers Cas. Ins. Co., 273 N.J.Super. 340, 347, 641 A.2d 1112 (App.Div.), certif. denied, 139 N.J. 185, 652 A.2d 174 (1994). And, in the context of *351 SLAPP[3] litigation, we recognized that the deprivation of a citizen's constitutional right to protest and communicate regarding public issues qualifies as a special grievance. LoBiondo, supra, 323 N.J.Super. at 424, 733 A.2d 516. There, we observed:
[W]e do not read "interference with one's liberty" as embracing only physical freedom of movement and hence as limited to restraint on that freedom. Rather, we interpret "liberty" as including the entire bundle of freedoms afforded by the Constitution-including freedom of speech and freedom to petition.
[LoBiondo, supra, 323 N.J.Super. at 424, 733 A.2d 516.]
In LoBiondo, supra, an objector vigorously protested a land-use application to expand a nearby beach club. 323 N.J.Super. at 395, 733 A.2d 516. The applicant filed an action against the objector, claiming defamation and malicious interference with business advantage. Id. at 395-96, 733 A.2d 516. We held that the objector could demonstrate a "special grievance" in the context of malicious use of process because of the chilling effect the applicant's complaint had upon the objector's First Amendment freedom of speech and right to protest. Id. at 422, 733 A.2d 516.
We reaffirmed the LoBiondo holding more recently in a similar land-use application context. In Baglini v. Lauletta, supra, the applicant for land-use approval involving rezoning filed a lawsuit against local objectors demanding more than $1 million in damages. We found the plaintiffs had submitted sufficient evidence of a special grievance to withstand the summary judgment motion in their malicious abuse of process claim against the developer:
The constraint upon the good-faith exercise of the protestors' bundle of freedoms afforded by the Constitution caused by a so-called SLAPP suit may indeed constitute special grievance in the context of a malicious use of process claim.
[338 N.J.Super. at 302, 768 A.2d 825 (internal quotations omitted).]
Of course, a determinant of whether a special grievance exists is what actually happened to the plaintiff in the prior proceeding she was forced to defend and "not what could have happened." Vickey, supra, 230 N.J.Super. at 149-50, 553 A.2d 34. Although there may exist the potential for loss of liberty or property, a court must look at the "reality" of what happened, rather than mere "potentiality." Klesh, supra, 295 N.J.Super. at 4, 684 A.2d 504.
Thus, in both LoBiondo, supra, and Baglini, supra, the interference with personal liberty and, beyond that, the impairment of the common weal, attendant upon the filing of the SLAPP lawsuits, had been actual, not merely potential, and sufficiently demonstrated on the facts in each case. In LoBiondo, we observed:
And we are convinced that the challenge to those freedoms attendant upon the filing of what may be conveniently referred to as a SLAPP suit and the constraint the suit imposes upon the exercise of those freedoms, both intended and thereby achieved, constitute a sufficient interference with one's liberty to satisfy the special grievance element. We point out that it is not only the defendant in a SLAPP suit who suffers. The common weal is obviously impaired as well since the consequence of *352 a SLAPP suit is not only to silence the defendant but to deter others who might speak out as well. Suppression of public debate on public issues and the placing of a priceoften a high oneon the right to petition for redress is, in our view, special grievance enough.
[323 N.J.Super. at 424, 733 A.2d 516 (emphasis supplied).]
And in Baglini, although the plaintiffs continued their prerogative writs complaint even after the developer's complaint was served upon them and were ultimately successful in setting aside the revisions to the zoning ordinance, we nevertheless found proof that plaintiffs suffered a real, not merely imagined, injury:
The [Lauletta developer's] complaint itself repeated ten times a demand of more than $1 million in damages. Plaintiffs testified that upon being served with the complaint, they became "very nervous." Many had trouble sleeping and eating. Others were concerned that they would "go to jail" or lose their homes or be required to withdraw their children from college. The Pfisterers, German immigrants, testified that their belief in the United States Constitution had been shaken by the event. Erich Pfisterer stated that the lawsuit "did its trick...." He concluded "I will definitely not get involved anymore." Melanie Parvin also stated that never again would she get involved with such a protest. Further, after commencement of the suit, Bernadine Koren's active political undertakings in the community dwindled; at the time of trial, "it was down to nothing."
[338 N.J.Super. at 302, 768 A.2d 825.]
We also found that impairment of the common weal had been demonstrated on the facts:
Melanie Parvin testified that the neighbors, who had previously "knocked on doors" and "put some money on the table" in support of the prerogative writs suit just "disappeared ... [;] they headed for the hills" when plaintiffs were served with the [Lauletta developer's] lawsuit. She stated that "we were poison" to the neighbors.
[338 N.J.Super. at 303, 768 A.2d 825.]
Unlike the plaintiffs in LoBiondo and Baglini, here plaintiff has failed to demonstrate an interference with personal liberty, much less an impairment of the common weal. The theft charge was administratively dismissed a mere two months after it was filed and well before any scheduled hearing in the municipal court. Plaintiff suffered none of the restrictions usually attendant to the criminal process. She was not arrested, held on bail, fingerprinted, photographed, or subjected to other physical liberty deprivations.
With regard to any chilling effect on the exercise of her right to enforce her civil rights, there was no proof that plaintiff was deterred from continuing to prosecute her bias crime complaint against defendant. Nor was there proof of a corresponding deterrence of others similarly situated. On the contrary, plaintiff testified against defendant in the municipal court proceeding, resulting in defendant's conviction of the lesser disorderly persons offense of harassment. And although the successful prosecution of defendant, alone, is not determinative of the absence of a special grievance, the failure to demonstrate any resultant infringement or discouragement of her right to vindicate or remediate claimed civil rights violations either now or in the future is, in our view, dispositive. In short, we conclude that the trial court properly held that plaintiff has not demonstrated a special grievance.

*353 III
We take issue, however, with the trial court's dismissal of plaintiff's public accommodation claims under both State, N.J.S.A. 10:5-4(LAD), and federal law, 42 U.S.C.A. § 1981. Its dismissal of these causes of action was based on a finding that plaintiff was not denied any of the advantages of a public accommodation, let alone on the ground of her race. We find that the trial court's treatment of plaintiff's public accommodation claims evinces an erroneous understanding of the policies underlying the provisions of the LAD and 42 U.S.C.A. § 1981, and a mistaken application of those statutory standards.
N.J.S.A. 10:5-4 guarantees all persons "the opportunity ... to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation," without discrimination on the basis of, among other things, race. Further, N.J.S.A. 10:5-12 not only prohibits the owner or operator of a public accommodation from denying the use of a facility on forbidden grounds, but it also renders unlawful any acts "discriminat[ing] against any person in the furnishing thereof...." N.J.S.A. 10:5-12(f)(1).[4] And although the statute specifically mentions only written communications announcing the unavailability of the facility on prohibited grounds, oral communications to the same effect are in no way immune. Franek v. Tomahawk Lake Resort, 333 N.J.Super. 206, 218, 754 A.2d 1237 (App. Div.2000).
It is well settled that "the LAD is intended to be New Jersey's remedy for unacceptable discrimination and is to be liberally construed." Id. at 217, 754 A.2d 1237. See also Cedeno v. Montclair State Univ., 163 N.J. 473, 478, 750 A.2d 73 (2000) (recognizing "the important public policies of the LAD ... and the need to construe [it] liberally to achieve those policies"); Andersen v. Exxon Co., 89 N.J. 483, 495, 446 A.2d 486 (1982) (same); Fraser v. Robin Dee Day Camp, 44 N.J. 480, 486, 210 A.2d 208 (1965) (same). "In construing the LAD, courts must give prime consideration to the object of the legislation and the evils it is designed to remedy." Franek, supra, 333 N.J.Super. at 217, 754 A.2d 1237; see also Hernandez v. Region Nine Hous. Corp., 146 N.J. 645, 651-52, 684 A.2d 1385 (1996) (recognizing the strong public policy underlying the LAD, and the importance of using the act to further these policies); National Org. for Women v. Little League Baseball, Inc., 127 N.J.Super. 522, 533, 318 A.2d 33 (App. Div.), aff'd, 67 N.J. 320, 338 A.2d 198 (1974).
The federal statute, 42 U.S.C.A. § 1981, accomplishes the same result although phrased in the language of contract.
*354 Thus, 42 U.S.C.A. § 1981 reads in pertinent part:
(a) All persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens.
(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.
(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.
The statute was derived from the Civil Rights Act of 1866 and from the reenactment of the 1866 Act in 1870. Subsections (b) and (c) were added in 1991. P.L. 102-166, 101.
Section 1981 reflects Congress's intent to enact sweeping legislation implementing the 13th Amendment to abolish all the remaining vestiges of the slavery system. Brown v. Philip Morris, Inc., 250 F.3d 789, 796 (3rd Cir.2001); see also Mahone v. Waddle, 564 F.2d 1018, 1030 (3rd Cir.1977). Its aim is to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace. Bobbitt v. Rage, Inc., 19 F.Supp.2d 512, 516 (W.D.N.C.1998) (citing Patterson v. McLean Credit Union, 491 U.S. 164, 170, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)). It therefore applies to retail transactions as well as to formal contracts. Hampton v. Dillard Dept. Stores, Inc., 247 F.3d 1091, 1102 (10th Cir.2001), cert. denied, 534 U.S. 1131, 122 S.Ct. 1071, 151 L.Ed.2d 973 (2002). As its legislative history reveals, in amending section 1981 [in 1991] Congress reaffirmed the view that section 1981 is `a critically important tool used to strike down racially discriminatory practices in a broad variety of contexts.' Callwood v. Dave Buster's, Inc., 98 F.Supp.2d 694, 703 (D.Md.2000) (quoting H. Rep. No. 102-40, pt. II, at 36 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 729 (Report of House Judiciary Committee on Civil Rights Act of 1991)).
In interpreting the LAD, the federal law has consistently been considered for guidance. Borngesser v. Jersey Shore Med. Ctr., 340 N.J.Super. 369, 380, 774 A.2d 615 (App.Div.2001). See Chisolm v. Manimon, 97 F.Supp.2d 615, 621 (D.N.J.2000) ([t]he New Jersey courts generally interpret the LAD by reliance upon federal court decisions construing the analogous federal antidiscrimination statutes.). See also Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97, 570 A.2d 903 (1990) (stating in the context of a gender and age discrimination case, that [t]he substantive and procedural standards that we have developed under the State's LAD have been markedly influenced by the federal experience.).
Moreover, in analyzing LAD claims, our courts use the framework of the federal anti-discrimination statute: Title VII of the Civil Rights Act of 1964 of 42 U.S.C. 2000e, et seq. (Title VII). See Grigoletti, supra, 118 N.J. at 97, 570 A.2d 903 ("In outlining approaches and infusing discrimination claims under the LAD with substantive content, we have adopted the Supreme Court's analysis of unlawful discrimination claims brought under Title VII of the Civil Rights Act of 1964 ... most cogently presented in McDonnell Douglas Corp. v. Green[5] ... "); Giammario v. Trenton Board of Education, 203 N.J.Super. 356, 361, 497 A.2d 199 (App.Div.) (LAD contentions appropriately analyzed *355 by examination of federal cases arising under Title VII), certif. denied, 102 N.J. 336, 508 A.2d 212 (1985), cert. denied, 475 U.S. 1141, 106 S.Ct. 1791, 90 L.Ed.2d 337 (1986).

(a)
In finding no discrimination under the LAD, the trial court reasoned that because plaintiff was not denied service, she received the benefit of her transaction. In other words, plaintiff was refused only the right to be given a new donut before she paid for the one she had bitten into, a benefit presumably denied any customer regardless of race. In so holding, the trial court overlooked plaintiff's claim, not that she was denied use of defendants' public accommodation on the day in question, but rather she was embarrassed and humiliated in her effort to do so and discouraged from further using the facility on that day and in the future. The trial court also misconstrued the reach of the LAD.
The LAD is not limited to outright denial of access or service. As noted, it also renders unlawful any acts discriminating against any person in the furnishing of the public accommodation. N.J.S.A. 10:5-12(f)(1). The statutory protection has been interpreted to reach situations where customers are merely discouraged from using a public facility because of verbal comments made to them about their protected status. See Franek, supra, 333 N.J.Super. at 218-19, 754 A.2d 1237.
In Franek, the plaintiff's decedent, an eighty-three-year-old amputee who was confined to a wheelchair, was not denied the use of the defendant's recreational facility. Rather, the owner and operator of the facility, when asked by the decedent's daughter to provide special consideration for the decedent's needs, responded: I don't want those kind of people here. Id. at 210-11, 754 A.2d 1237. The decedent never actually heard what was said but was very hurt when she later learned of the comment and wished, as a result, to leave the facility early. Id. at 211, 754 A.2d 1237. She never returned again. Id. at 211-12, 754 A.2d 1237. The complaint, which was dismissed on summary judgment, alleged that the defendant caused the decedent mental anguish and humiliation. Id. at 212, 754 A.2d 1237.
In reversing, we found the owner's remark constituted a prima facie basis for a claim of unlawful discrimination under the LAD and [e]specially when accompanied by some other proffers tending to show a design to discriminate on the forbidden grounds ... a sufficient reason for denying the defendants' motion for summary judgment. Id. at 217, 754 A.2d 1237. And the fact that the plaintiff's decedent was not denied the use of the public accommodation on the one occasion did not diminish the validity of her LAD claim. Id. at 216, 754 A.2d 1237. In this regard, we held:
It is unquestionably a violation of the LAD for the owner or operator of a public accommodation to tell a person, either directly or indirectly, that his or her patronage is not welcome because of a trait or condition which the LAD protects from discriminatory action, even though use of the facility on the particular occasion is not denied.

[Ibid.]
Such a rule, we found, vindicates the terms of the LAD and its underlying policies. Id. at 217, 754 A.2d 1237.
Here, the facts viewed most indulgently to plaintiff demonstrate that defendant called plaintiff a nigger several times in a loud voice when plaintiff complained about the quality of the food and then compared her unfavorably to white customers. Ultimately, defendant ordered her from the *356 store and plaintiff was never able to complete the original transaction.
As in Franek, supra, the focal issue is whether defendant acted with an actual or apparent design to discourage present or future use of the public accommodation by plaintiff on account of her protected status. In Franek, we held that the defendant's remark established a prima facie basis for a claim of unlawful discrimination in an LAD-based action sufficient to withstand a summary judgment dismissal motion. In this case, defendant's alleged conduct may be considered even more egregious than the defendant's in Franek. Here, the language claimed to have been used by defendant was significantly more offensive and more directly discriminatory than the remark uttered in Franek.[6] Moreover, the highly offensive racial slur was purportedly repeatedly uttered by defendant to plaintiff in the presence of other patrons, causing her upset and humiliation and ultimately resulting in her forced departure from the store.
Because genuine issues of material fact exist, it is for a jury to determine whether the racial insults were in fact uttered by defendant and, if so, whether they were designed to discourage plaintiff's use of a public accommodation on that day or in the future because of her race. We simply conclude that although the racial insults alone may not constitute a per se violation of the LAD, we must, for summary judgment purposes, accept that they were said, and that, together with the attendant facts and circumstances as alleged, they provide sufficient reason for denying defendants' summary judgment motion. Consequently, the trial court's dismissal of plaintiff's LAD claim usurped the jury's function. See Brill, supra, 142 N.J. at 540, 666 A.2d 146.

(b)
As with the LAD, the reach of 42 U.S.C.A. 1981 is similarly expansive. The statute covers purely private acts of racial discrimination. Runyon v. McCrary, 427 U.S. 160, 170, 96 S.Ct. 2586, 2594, 49 L.Ed.2d 415, 424 (1976). As amended, 1981 provides protection against discriminatory conduct occurring both during and after the formation of a contract. Benton v. Cousins Properties, Inc., 230 F.Supp.2d 1351, 1376 (N.D.Ga.2002). In this regard, the statute's protection extends beyond the making and enforcing of contracts to cover the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C.A. 1981(b). It addresses not only the denial of services or the right to contract for those services, but encompasses as well the deprivation of services by prohibiting discriminatory conduct which impinges on the `benefits, privileges, terms, and conditions of the contractual relationship.' Callwood, supra, 98 F.Supp.2d at 707. An individual who establishes a cause of action under 1981 is entitled to both equitable and legal relief, including compensatory, and under certain circumstances, punitive damages. Johnson v. Railway Exp. Agency, Inc., 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295, 301 (1975).
To state a claim under 1981 a plaintiff must establish that the defendant's actions were racially motivated and purposefully discriminatory. Bobbitt, supra, 19 F.Supp.2d at 516. Such intentional discrimination may be proved either by direct evidence or by circumstantial evidence *357 of a discriminatory motive. Hampton, supra, 247 F.3d at 1113; Bobbitt, supra, 19 F.Supp.2d at 516. To prevail in a claim of race discrimination under 1981, plaintiff must meet the burden-shifting standard of proof established for Title VII cases by McDonnell Douglas, supra. See Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir.1999). Under this standard, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence, and the burden of production then shifts to defendant to articulate a legitimate, non-discriminatory reason for its actions; plaintiff must then prove by a preponderance of the evidence that defendant's proffered reason is not its true reason, but a pretext for discrimination. McDonnell Douglas, supra, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677-78. To establish a prima facie case of discrimination under 1981 for purposes of the first stage of this analysis, the plaintiff must demonstrate that: (1) she is a member of a racial minority; (2) there was an intent by the defendant to discriminate against her on the basis of her race; and (3) the discrimination concerned one or more of the activities enumerated in the statute, including the right to make and enforce contracts. See Brown v. Philip Morris, Inc., 250 F.3d 789, 797 (3d Cir.2001).
Section 1981, although customarily arising in the employment context, has also been applied to discrimination claims arising in the retail sector. Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 868, reh'g denied and opinion supplemented on other grounds, 266 F.3d 407 (6th Cir.2001); Hampton, supra, 247 F.3d at 1102-04. Although most claims involving retail transactions allege conduct that prevents the formation of a contract, those alleging conduct that alters the nature or quality of the contractual relationship are also cognizable. Buchanan v. Consolidated Stores Corp., 125 F.Supp.2d 730, 734-36 (D.Md. 2001); Bobbitt, supra, 19 F.Supp.2d at 516. Indeed, courts have allowed a 1981 claim to proceed where, even though the plaintiff was allowed to complete the retail transaction, the defendant imposed terms and conditions on the contract which were different from those imposed on white customers, Buchanan, supra, 125 F.Supp.2d at 735, or a fundamental characteristic of the service provided was altered for minority customers. Bobbitt, supra, 19 F.Supp.2d at 518-20.
Thus, in a restaurant context, 1981 has been read to protect against the discriminatory denial of the accouterments that are ordinarily provided with a restaurant meal.... Callwood, supra, 98 F.Supp.2d at 703 (citing McCaleb v. Pizza Hut of Am., Inc., 28 F.Supp.2d 1043, 1048 (N.D.Ill.1998) (Section 1981 cause of action exists where the defendant denied plaintiffs opportunity to purchase and provided plaintiffs less than what they paid for)). This includes more than just food served, in that the experience includes being served in an atmosphere which a reasonable person would expect in the chosen place. Callwood, supra, 98 F.Supp.2d at 703 (internal quotations and citations omitted).
Although poor service, hostile treatment or rudeness alone may not be sufficient to establish a 1981 claim, Lizardo v. Denny's, Inc., 270 F.3d 94, 102 (2nd Cir.2001); Benton v. Cousins Properties, Inc., supra, 230 F.Supp.2d at 1376; Bobbitt, supra, 19 F.Supp.2d at 518-20, nevertheless, if race-based harassing conduct becomes so extreme as to prevent a plaintiff from enjoying the benefits of his or her contract, it may be actionable, Benton, supra, 230 F.Supp.2d at 1376, even absent proof of disparate, superior treatment accorded members of a non-protected class.
*358 Christian, supra, 252 F.3d at 870-71; Callwood, supra, 98 F.Supp.2d at 706. This is because in the retail context, it may be difficult, if not virtually impossible, to prove that similarly situated persons outside the protected group were treated differently. Christian, supra, 252 F.3d at 870-71; Callwood, supra, 98 F.Supp.2d at 706. To compensate for that difficulty, courts have allowed plaintiffs to proceed even in the absence of proof of disparate treatment where they can show that they were provided services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory. Christian, supra, 252 F.3d at 872.[7]See also Callwood, supra, 98 F.Supp.2d at 707.
This test, known as the Callwood test, has been followed in other jurisdictions. See Sawyer v. Southwest Airlines, Co., 243 F.Supp.2d 1257, 1273 (D.Kan.2003) (adopting the markedly hostile language of Callwood to reverse the lower court's grant of summary judgment on a 1981 claim); Leach v. Heyman, 233 F.Supp.2d 906, 910 (N.D.Ohio 2002) (following Callwood to find that defendant's conduct throughout the course of her dealing with plaintiff was indicative of racial animus even though the employee waited until after the customer had completed his purchase to call him a racial epithet); Bethea v. Michael's Family Rest. and Diner, 2001 WL 722566 (E.D.Pa. June 26, 2001) (relying on Callwood to find that plaintiffs had successfully pled the third element of their prima facie case under 1981 and denying defendant's motion to dismiss). But see Benton, supra, 230 F.Supp.2d at 1370 (rejecting the markedly hostile aspect of the Callwood test as legally incorrect).
As with the LAD, we find that the protective cloak of 42 U.S.C.A. 1981 extends beyond matters of outright denial of access to prohibit racially motivated alteration of service even where the transaction is ultimately consummated. As such, it is simply not enough to avoid liability for defendant to claim that plaintiff was provided the benefits of a public accommodation in a completed transaction or that defendant probably would have required a white customer to pay for the donut before giving her a new one. In this case, there is direct evidence of overt racial animosity that may have fundamentally altered the terms of the service contract, and may have caused plaintiff to leave before obtaining the benefit of her bargain. And there appears a legitimate dispute whether, in refusing her request for another donut, defendant treated plaintiff any differently than the manner in which she would have treated a white person. According to plaintiff, not only was she refused another donut before she paid for the firsta benefit presumably withheld from white customers as wellbut she was subjected to racial insults that effectively forced her to forfeit her right to complete the purchase. A jury may reasonably conclude that under these circumstances an *359 African-American customer exposed to racial slurs and epithets by the store's proprietor does not enjoy the same privileges and benefits of the contract with defendant as those enjoyed by white patrons. Viewed in this light, plaintiff's version, at the very least, gives rise to a genuine issue of material fact whether race-based contractual interference occurred.
We do not suggest that a racial epithet alone, no matter how offensive, suffices to establish a cause of action under § 1981, see Mullen v. Princess Anne Volunteer Fire Co., 853 F.2d 1130, 1133 (4th Cir. 1988); Stearnes v. Baur's Opera House, Inc., 788 F.Supp. 375, 378 (C.D.Ill.1992), since there must be interference with the contractual relationship beyond the mere expectation of being treated without discrimination while using the retail facility. Hampton, supra, 247 F.3d at 1118. Here, however, as already noted, the evidence suggests much more. Viewing the evidence in the light most favorable to plaintiff, defendant's conduct did more than violate plaintiff's mere expectation of being treated without discrimination, and went far beyond poor service. A jury might reasonably conclude that plaintiff's contract with defendant incorporated a right to receive service in an atmosphere which did not expose plaintiff to indignity, humiliation and embarrassment. It might also reasonably find that defendant's conduct was markedly hostile, designed to discourage plaintiff's use of the facility on account of her race, and actually resulted in her departure and forfeiture of the right to complete the transaction. As we said with respect to the LAD, where minority customers are so deterred from entering a commercial establishment because of racial animosity, they are effectively being denied the full benefits and enjoyment of a place of public accommodation. In our view, plaintiff has presented sufficient facts to insulate its cause of action from dismissal, entitling her to a plenary proof opportunity to show unlawful discrimination under 42 U.S.C.A. 1981. The trial court's contrary evaluation usurped the jury's function.

IV
Lastly, we turn to plaintiff's contention that the trial court erred in failing to address her belatedly raised civil bias claim under N.J.S.A. 2A:53A-21(a). The short answer is that this claim was never timely or properly asserted. It was raised for the first time only in a sur-reply brief submitted four days after oral argument on defendant's motion for summary judgment and on the very day of the trial judge's summary judgment decision, which was one day after the scheduled trial date. Plaintiff not only failed to plead this statutory cause of action, she never even moved to amend her complaint pursuant to R. 4:9-2 or otherwise properly raise the claim, despite numerous opportunities to do so. In fact, plaintiff never moved for reconsideration of the summary judgment decision that, understandably, did not address an issue raised for the first time on the very date the court's opinion was filed. To date, plaintiff offers absolutely no explanation why a statutory civil bias claim was never timely or properly asserted below.
As to plaintiff's underlying contention that she should now be permitted such relief, we simply decline to consider an issue, neither jurisdictional nor of great public interest, that was never properly presented to the trial court. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).

V
For these reasons, we affirm the trial court's grant of defendant's motion for *360 summary judgment dismissing plaintiff's claims for intentional infliction of emotional distress and malicious prosecution. We reverse its grant of summary judgment dismissing plaintiff's causes of action under the LAD and 42 U.S.C.A. 1981. We remand for further proceedings consistent with this opinion.
NOTES
[1] In 2001, well after the events leading to this appeal occurred, subsection (d) of N.J.S.A. 2C:33-4 was repealed by the New Jersey Legislature. L. 2001, c. 443, § 3. N.J.S.A. 2C:16-1 was then adopted, consolidating all bias crimes into a single action.
[2] We, therefore, need not decide whether a single racial slur occurring outside of the employment context is sufficient to constitute extreme and outrageous conduct. Although our Supreme Court has held that a single event may be extreme and outrageous under the right circumstances, Taylor v. Metzger, 152 N.J. 490, 512, 706 A.2d 685 (1998), that case involved a single racial slur uttered by a county sheriff who was not only the plaintiff's superior but also the chief executive and second highest-ranking law enforcement official in the county. Ibid. The Court expressly did not hold that a single racial slur spoken by a stranger on the street would amount to extreme and outrageous conduct. Id. at 511, 706 A.2d 685. Rather, the "power dynamics" of the workplace may contribute to the extremity and outrageousness of a defendant's conduct. Ibid.
[3] SLAPP is an acronym standing for Strategic Lawsuits Against Public Participation intending to impose on citizens the expense and burden of defending a lawsuit and thus force them to give up their protest. LoBiondo, supra, 323 N.J.Super. at 418, 733 A.2d 516.
[4] According to N.J.S.A. 10:5-12(f)(1), it shall be unlawful discrimination:

For any owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof, or directly or indirectly to publish, circulate, issue, display, post or mail any written or printed communication, notice, or advertisement to the effect that any of the accommodations, advantages, facilities, or privileges of any such place will be refused, withheld from, or denied to any person on account of the race, creed, color, national origin, ancestry, marital status, sex, affectional or sexual orientation or nationality of such person, or that the patronage or custom thereat of any person or any particular race, creed, color, national origin, ancestry, marital status, sex, affectional or sexual orientation or nationality is unwelcome, objectionable or not acceptable, desired or solicited ....
[Emphasis supplied.]
[5] 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).
[6] "The term `nigger' is one of insult, abuse and belittlement harking back to slavery days." Taylor, supra, 152 N.J. at 510, 706 A.2d 685 (quoting Bradshaw v. Swagerty, 1 Kan.App.2d 213, 563 P.2d 511, 514 (1977)).
[7] In Christian, supra, the Sixth Circuit, adopting in full the Callwood test, recently defined the elements of proof of a § 1981 claim in the context of commercial establishments, such as defendants', when similarly situated persons may not be available for comparison, as requiring a showing that plaintiff:

1) is a member of a protected class;
2) sought to make or enforce a contract for services ordinarily provided by the defendant; and
3) was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that a) plaintiff was deprived of the services while similarly situated persons outside the protected class were not and/or b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.
[252 F.3d at 872.].